## GENERAL COURT, MAY TERM, 1802.

### RINGGOLD's Lessee *vs.* MALOTT.

EJECTMENT for a tract of land called *The Number of Four,* situate in Washington county, and being a part of the reserve around *Conegocheige* Manor, and containing 481 acres.    Plea general issue, and defence upon warrant.    Plots were returned.

The plaintiff at the trial to make title to the land in the declaration mentioned, produced and read to the jury the order for *reserving* for the Lord Proprietary a manor of 10,000 acres of land, viz.    "May 28, 1724.    Whereas in the behalf of his Lordship the Lord Proprietary of this province, you are hereby required to reserve for his lordship's use the quantity of ten thousand acres of land, in places within the county as you shall be directed to lay out the same, and within such metes and bounds as may be most profitable to his lordship; and return your certificate of survey thereof into his lordship's land office, with all convenient speed, thence to be transmitted to the examiner general for due examination; and for your so doing, this shall be your warrant. Given under his lordship's lesser seal at arms, this 28th day of May, *anno dom.* 1724.

<div style="font-size:smaller">The time when a manor was laid out is a matter of fact for the jury, there being no record thereof to be found

The opinion of the judge of the land office cannot conclude the parties as to a question of law or fact.

The general court has a concurrent jurisdiction with the judge of the land-office as to the extent & operation of interfering grants; and it is the peculiar province of the jury to decide facts

The relation of a grant to the certificate of survey so as to over reach mesne grants, is founded on a principle of equity, & is a fiction of law.

An attempt to take up land within the proprietary's reserve was a fraud, & no quitable interest was acquired in the land so taken up.

The state stands in the place of the proprietary as to all lands belonging to him at the time of the act of confiscation</div>

To his lordship's surveyor of Prince George's county."

The plaintiff offered evidence to the jury to prove, that this is the order for reserving and surveying *Conococheague* Manor. That in virtue of this order, *Conococheague* Manor was actually laid out and surveyed previous to the year 1730, and was at that time known and established as *Conococheague* Manor. The plaintiff then produced and read to the jury the Lord Proprietary's order for *reserving* certain lands around his lordship's manors, dated the 28th June 1731, viz. "Sir—Whereas his lordship the right honourable the Lord Proprietary of this province of Maryland, hath ordered to make a resurvey upon all his honours, manors and lands, and to enlarge the same on both shores of this province, I do hereby, in the name and behalf of the right honourable the Lord Proprietary, order and require that you forthwith cause a reserve to be entered for his lordship on all vacant lands, rough or cultivated, and on all lands that are or may become escheat or forfeit to his lordship, adjoining to any of his said honours, manors or lands, or within the distance of three miles from them, or any of them. And that you likewise acquaint the several surveyors within this province thereof, that they may behave themselves accordingly. Given under my hand this 28th day of June *anno domini* 1731.          *Ben'dt Leon'd Calvert.*

To *Philemon Lloyd*, Esquire, Deputy Secretary of Maryland—*This.*"

"In pursuance of the above order a reserve is hereby made for and to the use of his said lordship on all vacant lands rough or cultivated, and on all lands that are or may become escheatable, or any ways forfeit to his lordship, adjoining to any of his honours, manors or lands, or within the distance of three miles from them or any of them.

To all concerned."

The plaintiff then produced and read to the jury the order for granting to *John Morton Jordan* the reserves on *Conococheague* Manor, dated the 15th of July 1768, viz.

MAY 1802

Ringgold
vs
Malott

"*Frederick*, absolute Lord and Proprietary of the Provinces of Maryland and Avalon, Lord Baron of *Baltimore*, in the Kingdom of Ireland. To the honourable *Benedict Calvert* and *George Steuart*, Esquires, judges of our land office in the said province of Maryland.

Gentlemen,—These are to authorise and require you immediately to pass your office a patent, or as many patents as may be necessary, to describe and ascertain the bounds of 7753 acres of land, lying and being within the reserve round *Conegochiegue* Manor in Frederick county, to *John Morton Jordan*, or any one applying for the same in his name, or on his behalf—the said 7753 acres being ascertained by a survey made by *James Calder* in 1767, and returned to my commissioners for the sale of my manors or reserved lands; which said 7753 acres of land within the aforesaid reserve of *Conegochiegue* Manor, lying in Frederick county, were by account received from my said commissioners then unsold. But for the said land I have since received of the said *John Morton Jordan*, a full consideration. You are to take notice to reserve in the patent or patents the usual quit rents of four shillings sterling per 100 acres, payable according to the established rules of your office; and for your so doing this shall be your warrant. Given under my hand and lessor seal at arms, at London, this 15th day of July, in the 17th year of my dominion of the said province, and in the year of our Lord 1768.

<div align="right">F. Baltimore, (L. S.)</div>

Signed, delivered and sealed, in the presence of
<div align="center">Rob't. Eden."</div>

The plaintiff also produced and read to the jury the patent to *John Morton Jordan* for *Reserve No.* 4, dated the 7th of March 1769, for "all that tract or parcel of land called and known by *The Number of Four*, lying in Frederick county, and being a part of the reserve around *Conegocheige* Manor, beginning," &c. containing 481 acres, agreeably to the certificate of survey thereof taken and returned into the land

MAY 1802

Ringgold
v.
Malott

office, bearing date the 28th of October 1768. The plaintiff also produced and read to the jury a deed from *John Morton Jordan* to *Thomas Ringgold,* grandfather of the lessor of the plaintiff, dated the 26th of October 1770, whereby in consideration of £10,150 sterling money, was granted, &c. "all those several tracts or parcels of land lying and being in Frederick county, to wit: *The Manor of Conegocheige,* containing by patent to *John Morton Jordan* 10,688¼ acres, and seven tracts of land lying within the reserve of the said manor, and known and distinguished in the patents or grants thereof to the said *John Morton Jordan,* by the numbers one, two, three, four, five, six and eight. *Number one* containing 458 acres; *number two* containing 1970 acres; *number three* containing 995 acres; *number four* containing 489 acres; *number five* containing 1735 acres; *number six* containing 1427 acres; and *number eight* containing 346 acres; together with," &c. The plaintiff also produced and read to the jury, the will of *Thomas Ringgold,* only child and heir at law of the above named *Thomas Ringgold,* the grantee, duly executed, proved and recorded, as the law directs, for passing lands and tenements, whereby the said *Thomas Ringgold* the son and testator, devised *The Number of Four,* the land in the plaintiff's declaration of ejectment mentioned, to the lessor of the plaintiff, and his heirs in fee.

The defendant offered evidence to the jury to prove, that the Manor of *Conococheague* was not surveyed or located until after the order for the reserves of the 28th of June 1731—And the defendant, to show title in himself to part of the lands in the declaration mentioned, being his defence as located on the plots, produced and read to the jury a patent for a tract of land called *Peter's Delight,* containing 18¾ acres, granted to him on the 18th of May 1759. The defendant also produced and read to the jury a certificate of resurvey for a tract of land called *The Resurvey on Peter's Delight,* containing 233¾ acres, dated the 4th of December 1759, reciting a warrant to resurvey *Peter's*

*Delight,* dated the 7th of June 1759, which said certificate of resurvey is endorsed, "June 5, 1761. Examined and passed." Also an endorsement that 10*l* 15*s* 0*d* for vacancy, and 15*s* 1*d* for one year and nine months rent to Michaelmas 1761, had been paid on the 17th of April 1761; and also the following endorsement: "This land not to be patented, being within his Lordship's reserve of *Conegocheigue* Manor, as Mr. *Prather* says. *Edw'd. Lloyd.*

10 March, 1763."

The defendant also produced and read to the jury an order from the judge of the land office, dated the 16th of February 1785, for correcting that certificate, and which order is as follows, to wit: "By the Chancellor, February 16, 1785. Upon the application of *Peter Malott,* Ordered, that the surveyor of Washington county lay down the within tract of land called *The Resurvey on Peter's Delight,* clear of *Conegocheigue* Manor, giving due notice thereof to the parties, and return a certificate of his work herewith to the land office.

Test.      *Jno. Callahan,* Reg. L. Off. W. S."

The defendant also produced and read to the jury the corrected certificate, dated the 5th of March 1785, with its endorsements, whereby it appears that the said tract contains, clear of *Conococheage* Manor, 233 acres. The said last mentioned certificate is thus endorsed: "May 7, 1785. Examined and passed." "Caveated by *Paul Westerberger,* 25 July, 1785." "It appears by a letter addressed to the chancellor, dated the 14th of April 1788, and signed *Peter Malott,* that the said *Malott* is fully satisfied that Mr. *Westerberger,* (the caveator of this certificate,) shall have the land that is in dispute between the said *Westerberger* and *Malott;* and that he lays no claim, right or title to the same. Test.      *Jno. Callahan,* Reg. L. Off. W. S."

"The caveat of *Westerberger* being withdrawn by his written order dated the 14th of April 1788, *it is ordered* by the chancellor that a patent issue on this certificate.

Test.      *Jno. Callahan,* Reg. L. Off. W. S. October 7, 1799."

MAY 1802.
Ringgold
vs
Malott

The defendant produced and read to the jury the patent for the said tract of land called *The Resurvey on Peter's Delight,* granted to the defendant on the 7th of October 1799, for 233 acres, stating the certificate of resurvey of the 4th of December 1759, the payment of the composition money, the order for correcting, and the corrected certificate of the 5th of March 1785, with the description of the courses, &c. as set out in the last mentioned certificate; and the defendant offered to prove that the locations of the said land are correctly made on the plots returned in this cause; and that the land located by the plaintiff as his pretensions interferes with and includes the land of the defendant as located for his defence. The defendant further produced and read to the jury an order from *Benedict Leonard Calvert,* governor of the then province, reciting an order of the judges of the land office for reserves on manors, as herein before set forth, dated the 28th of June 1731. The defendant also produced and read to the jury the certificate of *Monocacy* Manor, in the following words, viz. "May the 29th, 1724. His lordship's certificate of 10,000 acres. *Monocacy Manor.* Maryland ss. In obedience to an order from his lordship's land office, to reserve for his lordship the Lord Proprietary his use, ten thousand acres of land upon the head of Potomak river, or some one of the branches thereof, and to survey and lay out the same within such metes and bounds as may be most profitable to his lordship. These are humbly to certify, that I have surveyed for his Lordship the Lord Proprietary all that tract of land called *Monocacy Manor,* lying in Prince-George's county," &c. &c. Signed "*James Stoddert,* Dep. Surv. Prince-George's county."

Whereupon the defendant, by his counsel, prayed the opinion of the court, and their direction to the jury, that the patent granted to the defendant in 1799, did by operation of law relate back to the certificate, and give title to the defendant to all the land included in the said patent, which is also included in the lines of the certificate on *The Resurvey on Peter's Delight,*

dated the 4th of December 1759, as located on the plots returned in this cause, against the title set up by the plaintiff to the lands included in his patent of *The Number of Four* in the declaration of ejectment mentioned, and for which the present suit is brought.

*Shaaff* and *Buchanan*, for the defendant, contended, that as the plaintiff had showed in evidence a junior survey and senior grant, and the defendant a senior survey and junior grant, by the ordinary rules of *relation* the defendant's grant would relate to the date of his certificate of survey, and prevail over the grant under which the plaintiff claimed; because it could not be denied, that the defendant's certificate was returned, and the composition money paid for the land prior to the survey under which the plaintiff claimed. They said it would probably be urged by the plaintiff's counsel, that the land claimed by the defendant under his grant, lying within three miles of *Conococheague* Manor, was included within the *Reserves*, and therefore not liable to be taken up as vacant land. To which it may be answered, that the order of the 28th of June 1731, for reserving lands around the Lord Proprietary's manors, manifestly applied only to manors then laid off, and that there was no proof that *Conococheague* Manor had been laid off before that order, so that it could apply to it. This was the first order by which there were any reserves entered to his lordship's manors, and the only one produced by the plaintiff as at all applicable to *Conococheague* Manor, provided it can be made appear that that manor was laid off anterior thereto. Before this order, vacant land, adjoining manors, might be affected in the same manner as any other vacant lands.

The question is, when was *Conococheague* Manor located or laid off? The only evidence of any survey of that manor is that of the certificate dated the 25th of October 1736; but it is said there is a tradition in the land office that such certificate existed before. This is the only survey of the manor appearing upon

record, and as it is subsequent to the order of 1731 for entering reserves, that order cannot apply to it. This certificate of the survey of the manor recites it to have been in consequence of an order by Governor *Ogle;* and as it is stated to be a *resurvey*, &c. it will, no doubt, be contended by the counsel for the plaintiff, that there must have been a prior survey which has been lost or destroyed; and to prove which the order for laying off a manor of 10,000 acres, dated the 28th of May 1724, was offered in evidence, and relied upon by the plaintiff as the one in virtue of which *Conococheague* Manor was originally reserved and surveyed for the Proprietary. To rebut this evidence, the defendant offered in evidence the certificate of the survey of *Monocacy* Manor, for 10,000 acres, dated the 29th of May 1724, and it is contended that this last manor was surveyed and laid off in pursuance of the order of the 28th of May 1724, and is the manor in Frederick county which was confiscated and sold. *Conococheague* Manor could not have been laid out under that order, as the expressions in it manifestly shew. The order was directed "to the sheriff of Prince-George's county." This order issued from the judges of the land office, and as the survey of *Monocacy* Manor must have been in pursuant of some order, it is highly presumable, the officers of the proprietary having ample powers, that the order and the execution of it was *eo instanti*. By the certificate of 1736 *Conococheague* Manor contains 10,504 acres, which shows that before that time there had been no *actual* location made of it, even supposing it to have been reserved by the order of 1724. The plaintiff's counsel, it is likely, will rely on the circumstance of *Chew's Farm*, which was surveyed on the 10th of April 1734, calling for the fourteenth line of *Conococheague* Manor, as evidence that the manor must have been laid out before the year 1734. But if the order of 1731 applied to that manor, how could *Chew's Farm* call for a line of the *Manor?* The highest evidence is the certificate itself, which states that it was in consequence of an order by Go-

MAY 1802

Ringgold
vs
Malott

vernor *Ogle* in 1732. The last session *Benedict Leo-nard Calvert* acted as governor of the province ended on the 6th of September 1731, and the first session under Governor *Ogle* commenced on the 11th of July 1732. The words of the order of 1731 are express, that it extended only to manors in *esse*. The recital in the order states, that the Lord Proprietary had ordered to be made a *resurvey* upon all his manors, &c. and to *enlarge* them on both shores; and the se-cretary of the province was directed to cause a re-serve to be entered on all vacant land *adjoining* to any of the said manors, or within the distance of three miles from any of them—evidently meaning that the order was only to apply to manors then sur-veyed, because there could be no reserve around a manor not located, nor could the order of 1731 have the effect of laying off a manor and entering a re-serve to it at the same time. This would be wholly unnecessary, for in laying off the manor it might be sufficiently enlarged at once without requiring a re-serve, as the proprietary might have extended his manors as far as he chose, provided he had not before then granted the land. The proprietary did not hold his manors in a different right or manner from that of the reserves. If therefore the certificate of *Cono-cocheague* Manor in 1736 was a *resurvey* of that ma-nor, why not, in making it, include therein the re-serves if any had been previously attached to that manor? If this was a case between the Proprietary and the defendant, there would be no doubt but that the defendant's grant would prevail; because the pro-prietary had a right to grant any of his lands whe-ther held by him as vacant or as manors or reserves, and having once granted or contracted to grant, he could not afterwards grant the same land to any other person. The plaintiff therefore claiming under a grant made by the proprietary, when he had stipu-lated and was bound to grant the land to the defen-dant, must stand in the place of the Proprietary, and be subject to the defendant's equitable right. The defendant has a clear equitable title, as it is admitted

that his survey was made, and the composition mo-
ney paid for the land before the grant to *Jordan*, or
the order for the survey on which the grant issued.
If there were no reserves which applied to *Conoco-
cheague* Manor, was the land claimed by the defen-
dant liable to be taken up by a common warrant or
warrant of resurvey? There can be no doubt but it
could. But if the reserves did apply to that manor,
was the land liable to be affected by either of those
warrants? Before the revolution, there were judges
of the land office, whose duties were defined by cer-
tain rules, regulations and usages. Since then, by
the act of *November* 1781, *ch.* 20, *s.* 6, the chancel-
lor is constituted judge of the land office, "to hear
and determine all disputes concerning the validity of
surveys or grant of lands, agreeably to the former
rules of the land office." How are those rules to be
ascertained? By the judge of that office. His opinion
therefore upon any question decided under those *rules*
must be conclusive. By the 13*th section* of the act of
1781, "if the chancellor shall be of opinion that the
land claimed as vacancy was not originally included,
and shall order grant for the same, the person claim-
ing under such original patent shall have a right to
controvert, by trial at law, whether the same land,
or any part thereof, was originally included in the
certificate on which the original grant did issue, and
the opinion of the chancellor shall have no influence
on the question before a jury, but the matter shall re-
main in the same manner as if no determination of
the chancellor had been given." It therefore appears,
that by the 6*th section* of that act the chancellor is
made the judge of the questions of law, and by the
13*th section* he is made the judge of the questions of
facts; and that his opinion is final and conclusive as
to the question of law by him decided, but as to the
question of facts his opinion may be controverted by
a trial at law, and it is to have no influence on the
question before the jury. There can be no appeal
from the decision of the chancellor as judge of the
land office, unless such appeal is given by act of

assembly; and as no appeal is given from his deci-sions on questions of law, it follows that no question of law by him decided can be controverted in this court. The chancellor, as judge of the land office, determined that a grant should issue to the defendant, notwithstanding the memorandum on the certificate stating that the land lay within the reserves of *Cono-cocheague* Manor. This is a judicial decision by competent authority, and is entitled to the same weight as a decree of the court of chancery; and as there could be no appeal in this case, it is binding and conclusive upon this court. The decision that the grant should issue, and the issuing of the grant is a determination, either that the reserved land might be taken up and granted, or that there were no reserves attached to *Conococheague* Manor—or at least that land, circumstanced as that in dispute, was liable to be taken up and granted. All the facts in the case were known to the chancellor. He knew it was stated that the land lay within the reserves. Facts endorsed on the certificate prove it. The application was to ex-clude the land which lay *within the lines of the Manor,* and not to exclude any which lay within the reserves. The chancellor was not to travel out of the record—but his decision was on the case as it appeared before him. By the act of *April* 1782, *ch.* 38, *s.* 5, reciting, that "whereas there may be certificates in the land office which include land lying within some one of the reserves made by the late Proprietaries," it was "enacted that no grant shall issue on such certificate, but the same shall be corrected so as to exclude any land lying within any reserve." This act can only be construed to relate to those certificates for land in the reserves which had been laid out before the certi-ficates were returned, and the composition money paid thereon; otherwise it would take away vested rights. It meant to prohibit grants in cases where they ought not to issue. The grant to the defendant issued by the *special order* of the chancellor as judge of the land office. It is admitted that a grant could not issue for land which had been regularly granted. But the opi-

MAY 1802

Ringgold
vs
Malott

nion of the chancellor is, that land laying within the reserves of *Conococheague* Manor, was liable to be taken up; and if it is once established that the patent to the defendant regularly issued, the relation to the certificate must prevail.

*Martin,* (Attorney General,) and *Mason,* for the plaintiff. It is not contended that *Monocacy* and *Conococheague* Manors are the same, nor that the latter manor was laid out by order of Governor *Ogle.* The order of Governor *Ogle* was to *resurvey* that manor, and that order, and the certificate returned in virtue thereof, stating it to be a *resurvey* of *Conococheague* Manor, are strong and conclusive circumstances to shew that the manor had been surveyed before the date of the order under which it was resurveyed; and as there is no record of the original survey, and as the original survey itself cannot be found, the conclusion is that it has been lost or destroyed. This manor is next in order of time to *Monocacy* Manor—and it has always been understood and considered that *Conococheague* Manor is within the order of 1731 respecting reserves.

[*John Callahan,* Esquire, register of the land office, examined upon oath in court, stated that *Conococheague* Manor is next in order of time to *Monocacy* Manor. That the practice of the land office was to reject all certificates of surveys which included land lying within the reserves of *Conococheague* Manor.]

The certificate of the *resurvey* of *Conococheague* Manor is dated in 1736. This could not be the original survey of the manor, for on the 10th of April 1734, *Chew's Farm* was surveyed, and is stated as beginning at the fourteenth line of *Conococheague* Manor, which proves that the manor existed before the year 1731, and that the certificate in 1736 was a *resurvey.* The order of the 28th of May 1724, required the surveyor to reserve for his lordship's use 10,000 acres of land in places within the county as he should be *directed* to lay out the same. This was the order for reserving and laying out *Conococheague*

Manor. On the 29th of May 1724, *Monocacy* Manor was surveyed. How could an order given in Annapolis on the 28th of May 1724, be executed at the distance of 100 miles, the day after? Which must have been the case if that manor was surveyed under this order. But as such an execution of the order was wholly impracticable, it is evident that *Conococheague*, and not *Monocacy* Manor, was the one then surveyed. But it has been said, the order and the survey took place *eo instanti*. This would be to make the survey first, and then to pass the order directing it to be done; or the location must have been made in the land office without running a single line, or being nearer than 100 miles of the land. Why should the officers of the proprietary have recourse to shifts and tricks? There was no occasion for it. All the ungranted lands belonged to the proprietary, and he, or his officers for him, might have shut up the land office until manors and reserves could have been properly surveyed, without subjecting the surveyor to the necessity of certifying an untruth. As the orders for laying out manors and annexing reserves were not required to be recorded, most probably no notice has been taken of many of them. The order of 1724 directed the surveyor of Prince-George's county, (neither Frederick nor Washington counties having at that time been erected,) "to reserve for his lordship's use the quantity of 10,000 acres of land in places within the county as he should be directed to lay out the same, and within such metes and bounds as might be most profitable to his lordship, and return his certificate of survey thereof into his lordship's land office," &c. The certificate of *Monocacy* Manor, in reciting the order under which that manor was surveyed, states that it was "to reserve for his lordship's use 10,000 acres of land *upon the head of Potomak river, or some one of the branches thereof*," and because no other order at all applicable to that manor can be found on record, the defendant's counsel infer that the order of 1724 must be the one under which that manor was surveyed. It was not intend-

ed by the order for *resurveying Conococheague* Manor
that the resurvey should include any lands that had
been reserved. It was simply to resurvey the manor
according to its first intended metes and bounds. If
a man, having two tracts of land adjoining each
other, takes out a warrant to resurvey one of them,
he is not bound thereby, nor can he resurvey both
tracts under that warrant. So here the resurvey un-
der the order for resurveying the manor could not
include the reserves unless it had been specially au-
thorised by the order. The order of 1731 for en-
larging manors, by causing reserves to be made of
lands around them, applied to manors *de facto.* It
was applicable to *Conococheague* Manor, and to all
other manors then, or thereafter to be laid out. Under
the order of 1764 for laying off a manor of 10,000
acres of land in the western part of Frederick coun-
ty, no lands were taken up west of Fort Cumberland,
but a general reserve was laid in consequence of that
order *(a.)* His Lordship's manors were all fenced
or defended by reserves of all land within three miles.

The defendant has prayed the court to direct the
jury, that his grant does by operation of law relate
to the date of his certificate of resurvey, and give
title to all lands included therein against the title set
up by the plaintiff to part of the *reserves* of *Conoco-*
*cheague* Manor, which is covered by the defendant's
grant. Relation is a fiction of law, founded on prin-
ciples of equity; and if the design of the defendant
was to defraud the proprietary, no subsequent act
will give him such a title in equity as to allow him
the benefit of relation. The caveat entered against
the defendant's certificate was dismissed on a dispute
between him and *Westerberger*; and the defendant's pa-
tent is founded on his certificate of the 5th of March
1785, when it was corrected on his own suggestion
by order of the chancellor, after the caveat was with-
drawn—so that in any event it can only relate to that
time. The fact of a prior grant did not appear to
the chancellor. There was merely a memorandum

*(a)* See *Kilty's Land Hold. Assis.* 263.

on the certificate stating that the land "lies within the reserves, as Mr. *Prather* says." The chancellor could not have decided whether or not the land lay within the reserves without first giving notice to the persons interested and being satisfied of the fact by proper testimony. The caveat of *Westerberger* being withdrawn by his written order, the chancellor ordered a patent to issue to the defendant as a matter of course, it not appearing that any other person was interested in preventing it, or would be affected thereby. *Chew's* warrant issued in 1726, and the survey was made of *Chew's Farm* on the 10th of April 1734. A right was acquired by the warrant which would affect any vacant land in the county. The state of Maryland could not grant any land except that acquired from the Proprietary. It could have neither a legal title to, nor an equitable interest in the land granted to the defendant. The state could only take the interest which the Proprietary had, and he had no right or interest which could devolve upon the state, as all the right which he ever had in the land he granted to *Jordan*. By the act of *November* 1781, *ch.* 20, *s.* 11, grants were directed to be issued on all certificates &c. unless grants had before then regularly issued for the same lands to other persons, or unless the chancellor on hearing should otherwise determine. Here the state had nothing to grant, of course the grant to the defendant issued irregularly, and ought to have been refused. If it appears to the jury that the land claimed by the defendant lay within the reserves, then there will be no question that he ought not to have had a patent, as it will be evident he had no equitable interest therein, and his attempt to include reserved land within his survey, was an imposition upon the Proprietary.

*Key*, in reply, insisted that there was a clear equitable interest in the defendant to the land included in his resurvey of the tract called *The Resurvey on Peter's Delight*, which could not be defeated by the plaintiff's grant; and that the defendant's grant must re-

late to the certificate of resurvey in 1759. To show that relation is founded in equity, and will overreach all mesne grants, he cited *Selwyn vs. Selwyn*, 2 *Burr.* 1131. He also cited *Howard vs. Cromwell (a)*, which he said was the first case where the doctrine of relation was attempted to be impeached. He considered this case as if there were no reserves attached to *Conococheague* Manor. It was evident, he said, there were no reserves in 1736 which could apply to that manor. For there could be no reserves where there was a *resurvey* of a manor. If the object was to enlarge the manor, why not do it on the resurvey? Under an order to resurvey, adjoining vacant land to any extent might have been added, and indeed reserved lands, as to the Proprietary, might be considered as vacant lands. In ordinary cases the relation here contended for would be complete, and there was in this case no ground against the defendant except the idea of reserves. The plaintiff to recover, must show that the reserves were created. Having failed to do so, he must be defeated. The arguments of his counsel rest upon supposition only. The order of 1724 directed the surveyor "to reserve for his lordship's use 10,000 acres of land, in places within the county as he should be directed to lay out the same." There was no particular designation in the order where the manor was to be located; that depended upon future directions to be given to the surveyor. Were those directions given? The presumption is that they were, and that they directed that the manor should be reserved "upon the head of Potomak river, or some one of the branches thereof"—and that in virtue of those directions *Monocacy* Manor was surveyed. There is no evidence, he said, of the certificate or any survey of *Conococheague* Manor, nor are there any traces of that manor before the year 1734 when *Chew's Farm* was surveyed. No reason can be given why a document so important as evidence of the Proprietary's rights should be neglected to be preserved by being placed on record. The question is, who has the prior

(a) *Ante* 115.

May 1802

Ringgold
vs.
Malott.

equity? It is clear that the defendant has. It is evident there could be no belt or zone around *Conococheague* Manor. There were many manors laid off before the year 1731, the certificates of which appear on record. As land became more valuable, the Proprietary had two objects in view—to ascertain the lines, and to enlarge his manors. The order for reserves in 1731 could relate only to anterior manors. The Proprietary's orders to the governors directing them to cause reserves to be made, are not to be found upon record. Governor *Calvert* in 1731, stated the order of the Proprietary to be "to make a *resurvey* upon all his honours, manors and lands, and to *enlarge* the same." There could be no reason why there should be reserves to manors not in existence, and it is evident the Proprietary intended only to apply the reserves to manors then established, as he might have laid off manors *ab libitum*. He could have reserved what lands he pleased, and instead of 10,000 acres, directed double the quantity to be laid off into a manor. The order of 1731 could not relate to manors thereafter to be created. The chancellor as judge of the land office must have decided the fact that there were no reserves attached to *Conococheague* Manor. It was the practice of the land office, and not by any particular act of assembly, that grants should not issue for reserved lands. The Proprietary officers were zealous to promote his interest, and they might have been under the impression that the order of 1731 applied to *Conococheague* Manor. The fact that *Chew's Farm* calls for a line of the manor, shows that there were no reserves around it. For if there had been, *Chew's Farm* could not have called for a line of the manor, but must have called for a line of the reserves, unless it included a part of what is now contended to have been the reserves. For as no land could be appropriated by a common warrant, until a survey was made, or a designation by a special warrant or location in the surveyor's office, the warrant granted to *Chew* in 1726 could give him no right in any particular land before his survey in

1784. On the 13th of July 1750, a tract of land called *Salisbury,* was surveyed and granted in February 1750, (O. S.) which tract calls to begin at a line of *Conococheague* Manor. This shows that there was no knowledge of the reserves when that survey was made, and as the Proprietary granted *Chew's Farm* and *Salisbury,* both evidently lying within the reserves, if the manor was laid off before 1731, there could be no reason for refusing a grant to the defendant. By the act of 1781 the state stands in the place of the Proprietary, and could grant that which the Proprietary might have granted; and as he could have granted the land, and indeed, having received the composition money he was bound by contract to grant to the defendant in 1759, admitting it to lie within the reserves, the state therefore was bound in equity to perfect the contract entered into between the Proprietary and the defendant, and which has been done by the grant issued by order of the chancellor.

CHASE, Ch. J.(a). The court are of opinion, that the time when *Conococheague* Manor was laid out is a matter of fact to be determined by the jury, and that if they find it was laid out subsequent to the 28th of June 1731, the reserve made by the Lord Proprietary by his order of that date does not attach to it.

The opinion of the judge of the land office, as far as it is expressed by his order, that patent should issue to *Malott* on his certificate, cannot conclude the parties in this case as to the fact when *Conococheague* Manor was laid out, or as to the fact whether there was any reserve annexed to it. This court in all questions relative to the extent and operation of interfering grants, have a concurrent jurisdiction with the judge of the land office—and it is the peculiar province of the jury to decide facts.

In the case between *Malott* and *Westerberger,* it does not appear to the court that the judge of the land office decided any fact by his order that patent

(a) *Duvall* and *Done,* J. concurred.

should issue. The certificate having been corrected pursuant to the order of the late judge of the land office, and *Westerberger's* caveat being withdrawn, all contest between *Malott* and *Westerberger* ceased, and the order for issuing a patent to *Malott* on his certificate was a matter of course, no other objection appearing.

MAY 1802

Ringgold
vs,
Malott:

The relation of the patent to the certificate, so as to overreach mesne grants, is founded on a principle of equity, and is a fiction of law, introduced for the attainment of justice, and to prevent circuity of action—this court doing that which a court of equity would effect. And it is the opinion of the court, that if the jury find *Conococheague* Manor was laid out after the order of the Lord Proprietary in 1731, that in such case there was no reserve attached to it, and the defendant had a complete equitable title to the land:—But if the jury find otherwise, his attempt to take up land within the reserve, was a fraud and deception on the Proprietary and his officers, and no equitable interest was acquired in the land by his certificate and payment of the caution money.

[As between the Proprietary, and a person who takes out a common warrant, such person acquires a right to have his warrant located on any vacant land in the county, to the surveyor of which the warrant is directed, it being the inception of the contract between the Proprietary and such person, for so much vacant land as is expressed in the warrant, and no after act of the Proprietary laying out manors or making reserves, could defeat such interest(*a*).]

By the act of confiscation all British property was seized and vested in the state. The state, as to lands of the Proprietary, stood in his place, and they remained subject to all claims and rights created and acquired under the Proprietary—and supposing these circumstances to exist, which would have vested an quitable interest in *Malott,* his grant will have rela-

---

(*a*) This paragraph, though constituting a part of the opinion of the Court, was not inserted in the bill of exceptions which was signed.

MAY 1802

Ringgold
vs.
Malott.

tion to his certificate, and control the operation of the grant to *Jordan* so far as they interfere.

The plaintiff excepted. Verdict for the plaintiff for part only of his pretensions, (the jury being of opinion that *Conococheague* Manor did not exist until after the year 1731,) as to the residue the verdict was for the defendant. Judgment upon the verdict. There was no appeal to the Court of Appeals.