Bland, Chancellor.
This caveat standing ready for hearing,. and the argument of the caveator’s attorney having been heard, and the notes of Browning’s counsel having been read, the proceedings were thereupon read and considered.
The Chancery Court of England has always been considered as the prototype of that of Maryland; and, that the one has been in fact the exemplar of the other, in almost every respect, might be shewn by a comparison of the various offices, powers, and jurisdictions of each of them. The chancery of Maryland, as well as of England, was originally resorted to as an Oficina Brevium., In cases of scire facias, to repeal letters patent, and in some others, in which the Chancellor sits as a court of common law, his authority is substantially the same in Maryland as in England. As mere courts of equity, there is scarcely any difference between the Court of Chancery of Maryland, and that of England. And the form of proceeding by caveat, according to which the Chancellor is - now called'upon to act, is one which has been derived from the chancery of England; and is regulated by forms and principles similar to those by which the English mode of, proceeding by caveat is governed. It may be well, therefore, for the better understanding of this, and all similar cases, briefly to review the mode of obtaining a patent grant for land in England, and in this State; and the general doctrine in relation to caveats, before the merits of the case, now before the court, are taken up, considered and determined.
The king of England being invested with a limited sovereignty over the realm, all public property belongs to him in that capacity; and all lands are said to be held directly or indirectly of him. The king is also invested with authority to create corporations, to grant franchises, and to dispose of any lands, or public property, at his pleasure. Anciently, a large proportion of the king’s revenue arose from lands granted by him; as to which the Chancellor‘and Treasurer had checks upon one another. The Chancellor made out all patents for lands; for, no real estate was to be parted with by the crown without the great seal; but then the rents of such tenures were to be accounted for before the Treasurer.(a) The granting of a franchise, or of any estate of inheritance in lands, could only be done by a regular patent under the great seal, specifying particularly the franchise, or estate granted. But the same degree of *302 solemnity and caution was not required in disposing of all other things ; for, the king might dispose of a chattel under his privy seal; or he might make a lease for years of any crown lands without a patent under the great seal.(b)
But, after any land had been once legally granted by the king, it could, in no case, be fully and particularly revested in him, so as again to become the subject of a new patent to an individual, without office found, or something equivalent to an inquest of office; for it is said to be a part of the liberty of England, that the king’s officers should not enter upon'other men’s possessions, till a jury had found the king’s title. Therefore, where the king’s title appeared on record, his officers might enter without any office found; as where the lands were held of the crown and the tenant died without heirs, the officers of the king might enter; because the tenure whereby the king’s title appeared was upon record. So by the common law, where lands belong to nobody, the king’s officers may enter; because by the law, the land is in the crown; for the law entitles him where the property is in no man; but if any body else were in possession, the lands could not be divested without matter of record. There are two kinds of offices, one an office entitling, that vests the estate and possession of the land in the king where he had but a right or title before; and another called an office of instruction, and that is when the estate of the land is lawfully in the king before, but the particularity of the land does not appear of record. And therefore, although, where the king is entitled by matter of record, there is no - need of an office to entitle him; yet there was always an office of instruction found, in order that the land might be distinctly ascertained and specified ; for until that was done, although the title was in him, he was prohibited, by statute,(c) from making any grant of them to an individual. And therefore, in all cases, where it is proposed to place any lands, which had been held by an individual whose right had been confiscated or forfeited; or whose estate was escheatable, because of its being such as he was incompetent to hold; or whose title had escheated, because of his death intestate without heirs, it was deemed neces'sary to have the facts found by an inquest- of office - taken under a commission, or a writ of escheat, a diem clausit extremum, a mandamus, a melius inquirendo, or the like; or by an inquest of office taken by the escheator *303 in virtue of his office.(d) But it not unfrequently happens, that the king’s title to lands, which has thus accrued to him by confiscation, forfeiture or escheat, remains wholly unknown to the public officers whose duty it is to have it distinctly and specially replaced in his hands by an inquest of office; therefore, in such cases, where an individual by petition to the king first makes known the fact, that there is such an interest; and prays some reward upon the ground of discovery, if it can be made out; the proper proceedings are thereupon instituted; and if the escheat be established, the petitioner is usually rewarded with a lease of the property for his discovery, (e)
Considering the numerous and various matters of public concern by which the attention of the king is presumed to be unceasingly engaged; in order to- prevent mistake, imposition and fraud, it is provided, that all his grants must pass through certain preliminary grades and forms. , The proposed grant is by a warrant from the crown first put into the form of a bill by the attorney and solicitor general, which is then to be sealed with the privy signet by the principal secretary of state, and approved and signed by the king; it is then carried to the keeper of the privy seal, who makes out a writ thereupon to the chancery, which, if no objection be apparent, or then interposed, is a warrant to affix the great seal to the patent. Upon which it is enrolled, within the time limited by law, in the Petty Bag or the enrollment office, which appears to have originally constituted a part of the court itself, and which is, for all such purposes, a legal court of record.(f) But if before the great seal has been put to the patent the proposed grantee dies, the application so totally fails, that the whole proceeding must be revived, or renewed by the heir or person who succeeds to the pretensions of the applicant.(g) The object of all these several forms is, that the proposed grant may be narrowly inspected by all those officers whose duty it is to inform the king if there be any thing contained in it which is improper or unlawful to be granted; indeed, it is said to be the duty of all the king’s subjects to see, that he is fully informed as to such matters.(h)
*304 But those officers whose duty it is, thus carefully to examine and consider the nature of the proposed grant, before they pass it, cannot be presumed to know any thing more of it than what appears upon its face, or than what is represented to them by the applicant; and yet there may be a variety of circumstances, not so apparent, or disclosed, which, if made known,' would clearly demonstrate the great impropriety and injustice of passing it. Hence, in all such cases, where the interests of a third person are likely to be materially affected by the granting of a patent, its emanation may be opposed by such third person; for, when the immediate possession of land is granted to two several persons, it begets suits and troubles, which the common law will not suffer in the king’s grants under the great seal ;(i) and therefore, to prevent such mischief, it is said, that there are three several stages at which the making out of a patent may be opposed; first, when it is under the consideration of the king ; secondly, when it comes to the privy seal; and thirdly, by a caveat when it comes to the great seal.(j) This last appears to be the most formal and usual course.
In putting the great seal to a patent the Chancellor acts in his legal capacity; and therefore, .in hearing and deciding upon any controversy which may arise, as to the propriety of passing a patent, he sits as a court of common law;(k) and so long as an application thus stands before the Chancellor for the great seal,' he may indulge the parties with further time upon such terms as he may deem equitable and proper; but after the great seal has been once put to the patent, then all further control over it by the Chancellor in a summary way on a caveat ceases.(l)
A caveat in chancery is a petition or suggestion entered by the party, who supposes himself likely to be injured by the granting of a patent, respectfully cautioning the Chancellor not to put the great seal to the instrument until the applicant has been called upon to make out a proper case for his patent; and, also to shew cause, if any he has, why the objections thus made to its being granted should not be allowed. Upon which a day is appointed for the healing, of which the applicant is notified ; and in the interval the parties are allowed, if required, to take testimony in relation to any controverted facts. And at the hearing, the applicant for the patent, considered as a plaintiff, or as holding the affirmative of the *305 matter thus put in issue, is allowed to open and conclude the argument. After which the Chancellor may overrule, or allow the objections; from which there is no appeal: but no costs are given if the caveat be not unreasonable.(m) If the objections are overruled the caveat is discharged, and the grekt seal is at once put to the instrument, and the grant is thus perfected and issued; but if the Chancellor sustains the objections, he then withholds the great seal, and represents the whole matter to the king; who may nevertheless order- a patent to be issued or not at his pleasure, (n)
The charter of Maryland gave, to the lord proprietary an absolute right of soil to all the territory comprehended within its specified boundaries; and constituted him vice-roy over the province. Thus clothed with an unqualified title to all the lands, and a limited, yet large extent of sovereignty over the projected State, he commenced the settlement of the country in March 1634 ;(o) and, as might have been expected, from the nature of things, the parcelling out and sale of lands called for his earliest attention. It appears accordingly, that among the first things done by the proprietary, was to adjust and publish the terms upon which he proposed to dispose of his lands, and the manner in which an individual might obtain a legal title to any specified quantity he might want; but of those terms, or conditions of plantation, it will here be unnecessary to say any thing further, in regard to original grants from the proprietary, than that lands were given to emigrants as an encouragement to their coming into and settling the country; or they were sold at a low,- but stipulated price payable in money. But, large quantities of land, after having been thus alienated, were continually reverting to the proprietary, considering him merely as *306 one of the contracting parties ; because of the purchasers failing to comply with the conditions of plantation on their part; or the lands which had been so disposed of by the proprietary were returned to him by forfeiture or escheat.
By several proclamations of the proprietary, the first of which was published in November 1725, it was made an express condition of all future contracts between himself and the purchasers of his lands, that the purchaser should, after the survey, pay the whole purchase money and take out a patent within two years from the date of the warrant; or, on his failing to do so, he should forfeit the imperfect title he had so acquired, if any one should thereafter discover the fact, and take out a warrant, and obtain a patent thereon for the same land; who as a reward for his discovery was allowed a warrant on the payment, at the time, of one-tenth of the amount of the composition money then due, and the remaining nine-tenths on tire return of the certificate. (p) This may be regarded as a kind of escheat; and the power of the proprietary, in such cases, to make a new disposition of the land as being thus, according to the terms of the contract, restored to him by operation of law without any inquest of office whatever; for the contract between the proprietary and the then immediate purchaser and holder, being upon record, was considered as equivalent to an inquest of office, (q)
But where, after the whole legal estate in fee simple had passed out of the proprietary, the individual owner had, by being convicted of a crime, forfeited his estate; or where the lands which had been so granted had, by the death of the owner intestate and without heirs, escheated, it seems to have been deemed necessary, during the earlier periods of the proprietary government, .here, as in England, to have the fact of such title and of the nature and extent of the lands ascertained by an inquest of office before the same lands could be again disposed of by the proprietary. The first settlers being, for the most part, poor adventurers, it often happened, that they died intestate without leaving any known heirs; and, therefore it was, that, for many years after the settlement of the country, cases of escheat for want of heirs were so very frequent, (r) The inquests in all such cases, although there was at one time an escheator,(s) were ordered to be taken here, as *307 in England, by a writ'of mandamus, or a diem, clausit extremum, directed to the sheriff of the county in which the lands lay; upon the return of which, as a reward to the discoverer, at whose instance the mandamus had been issued, he was allowed to have the pre-emption of the land so escheated at two-thirds of its value, or that it should be sold, and one-third of the proceeds of sale paid to hina.(t)
But, in that interval of time, between the years 1692 and 1715, when the government of the province was taken into the hands of the king, although the proprietary’s right of soil was admitted, it was yet found difficult, or impracticable to have any such inquests of office executed for his benefit, and as a safeguard to the rights of the citizen; and therefore, during that time, his agents issued warrants, and made out grants for all escheated lands without any previous inquest. After the government was restored to the lord proprietary, the granting of escheated lands without any previous inquest of office was still continued ;(u) and this practice having been followed up in the same way ever since, under the State government, the holding of an inquest of office in any such case must now be considered’as having been thus virtually abolished, (v) He who discovers the escheat and sues out an escheat warrant, is entitled, as formerly, to have a patent for the land on paying two-thirds of its value; which value, instead of being ascertained, as formerly, by inquest, is now estimated and returned by the surveyor under his oath of office, (w) It has been laid down since the revolution, that the State, as to the lands of the proprietary, stands in his place; and that they remained subject to all claims and rights created and acquired under the proprietary ;(x) and further, that by the acts of confiscation, passed during the revolutionary war, all British property was seized and vested in the State wfithout office found, (y)
What is here said, in regard to inquests of office, must however be understood as applying only to cases where the lands of a citizen have escheated on Ms death intestate without heirs; for *308 as to an alien, it has been held, that his title, which he has acquired by purchase, is good against every body but the State, and cannot be divested without office found ;(z) although it would seem, that, as regards the interests of creditors, it may be considered as having devolved upon the State without any previous inquest of office.(a) It is now unnecessary to say any thing of forfeited lands, of which it was formerly made the duty of surveyors to give notice,(b) since it has been declared, that no- conviction or attainder shall work corruption of blood or forfeiture of estate.(c)
In the original conditions of plantation, it was declared, that a legal title should be made to all purchasers from the proprietary by a grant under the Great Seal of the Province ;(d) thus indicating at once, and from the outset, to all purchasers, that there should be a Chancellor, or keeper of the Great Seal of the Province; whose duty it should be here, as was the duty of the similar officer in England, to pass upon and authenticate all patent grants for lands.(e) But although by a commission, dated on the I5th of April, 1637, the first governor was constituted “ chancellor, chief justice, and chief magistrate within the province, until officers and ministers of justice should be appointed;”(f) yet grants for lands to the first settlers were issued and authenticated under the hand and seal of the governor alone; and it was not until about the year 1644, that patent grants were authenticated by the Chancellor under the Great Seal of the Province, according to the English mode of making out such deeds.(g) From that time, however, to the present, patent grants have been made out and authenticated according to the form now in use.
The increase in population, and the spreading out of the settlement of the country, so multiplied the demands for the proprietary’s lands, that in the year 1680, for the greater regularity and desjiatch of business in that respect, a Land Office was established; in which it was directed, that authentic records of all proceedings in relation to the sale and granting of lands should be made and kept,(h) certified copies of which, as of any other records, are held to be legal evidence, (i) This office was appended to the common law *309 side of the Court of Chancery of Maryland, and was evidently considered as corresponding, in almost all respects, to the Petty Bag, or enrollment office of the English Court of Chancery. For, in all the proceedings in chancery, in relation to the repeal of letters patent for land by scire facias, and lo the business and records of the Land Office, the court is always specially designated as “ The Chancery Court of Records ;”(j) for the express purpose, as it appears, of distinguishing its common law jurisdiction, in relation to patent grants for lands, in which respect it was, by analogy to the English system, deemed a court of record, from its jurisdiction as a mere court of equity, in which capacity, according to the English law, it was not a court of record.(k) The expression, “ the Chancery Court of Records,” answered very well at the time, and may still servej with a recollection of the English law to which it refers, as a sufficiently apt and clear designation of the distinction between the two sides of the Court of Chancery, between the two capacities of common law and equity in which it acts ; but at present, the Court of Chancery of Maryland must be considered as in all respects a court of record; since all its proceedings, as well in equity as at common law, are recorded; and it has all the powers incident to the jurisdiction of such courts of record.
The lord proprietary’s lands always yielded him a very large proportion, and sometimes the only revenue he derived from his Province; and therefore here,'as in England, the mode of obtaining titles to lands seems to have been regulated, as well with a view to the safe collection of this branch of the revenue, as to the assuring of justice and fairness to the contracting parties. Before the establishment of the Land Office, here, as in England, the applicant for a patent commenced by obtaining a warrant from the sovereign, under his seal at arms, or the Lesser Seal of the Province ;(l) by which, on the purchase money being paid to the treasurer, (m) the surveyor was authorized to lay out the land as required ;(n) and upon a certificate of the survey being returned to the Chancery Office, the secretary, who was then the recording officer of the Court of Chancery,(o) if he approved of the proceedings, made out the patent grant, (p) which was to be finally passed upon and authenticated by the Chancellor, (q)
*310 It must be recollected, however, that the lord proprietary, like the king of England, had the power, and actually did make a multitude of leases for years of his lands, without the solemnity of a patent grant under the great seal. These leases were rarely or never at any time signed or sealed by the Chancellor, nor could he in any way check or control the making of them, as he might the passing of a patent grant for an estate of inheritance when it came for the great seal, if a caveat should be then filed; and therefore it need only to be observed here, that none of the proceedings which may be met with in our records, in regard to those proprietary leases, can have any relation to the matter now under consideration, (r)
But after the establishment of the Land Office, the mode of proceeding to obtain a legal estate of inheritance in lands, from the proprietary, was somewhat differently, and much better regulated. The Constitution of the Republic directed that there should be two registers of the Land Office appointed, one for the Western, and the other for the Eastern Shore, (s) And these Land Offices were organized accordingly by a re-establishment of tire connexion which had formerly subsisted between the Court of Chancery and the Land Office, and an adoption of all the regulations and the law by which that office had been formerly governed, in so far as they were consistent with the new frame of government, (t)
There were under the proprietary’s government, and still are, five different modes of beginning to obtain a title to lands; or, in other words, five several kinds of warrants, all of which are now issued by the register under his signature and the seal of his office,(u) by which an applicant may obtain a patent for the land he proposes to purchase. If it be his object, in general, to obtain a certain quantity of vacant land, any where, without regard to any particular space, or tract, then, on paying one-half of the stipulated price to the treasurer, he gets from him a tiding ;(v) upon which the register of the Land Office gives him a common warrant, directed to the surveyor, commanding him to lay out the specified quantity of land as required. But if required by the applicant, on presenting his titling, the register will insert a particular description of the land aimed at in the warrant itself; which specification gives to it the denomination of a special warrant ;(w) or the register may, with *311 out any such titling, issue a common or a special warrant, for vacant land, in lieu of warrant remaining unexecuted in whole or in part; or in lieu of deficiency found, on resurvey, in original tracts, and for composition paid in cases in which the certificate, or grant shall afterwards have been vacated; or where certificates ordered for correction becomeivoid hy not being afterwards returned within the time prescribed by law. (x) Or if the applicant, after having thus obtained a common warrant, causes a particular description of the land he wishes to obtain to be noted on the surveyor’s book, it has, from the date of such entry, all the effect of a special warrant, (y) But, if the applicant had already obtained a title to a tract of land, by having had it surveyed, and a certificate returned, or by having obtained a patent for it, and only wished to add to it some contiguous vacancy, he may obtain at once from the register of the Land Office, a warrant of resurvey, directed, in like manner, to the surveyor.(z) So if any one had caused a particular tract of land to be surveyed, but had failed to comply with the conditions of plantation, and formerly, to take out a patent, or now to compound on the certificate, within the one year, as formerly limited by the proclamation, and now by the law,(a) any one else, by an application to the register of the Land Office, and paying to the treasurer one-tenth of the composition then remaining due,(b) may obtain from the register a proclamation warrant authorizing the applicant to take up the same lands.(c) But when, by reason 'of the sickness or death of the examiner-general, warrants could not be examined and returned in time, the Chancellor has, by a general order, suspended, for a time, the right to take out proclamation warrants.(d) And finally, any one by an application, setting forth that a certain designated tract of land had actually escheated by the death of the last individual owner intestate and without heirs, may obtain immediately from the register of the Land Office, an escheat warrant authorizing the applicant to obtain a patent for the land so specified, (e)
After the applicant has procured any one of these five kinds of warrants, his next step is to have the land surveyed in the manner prescribed by the rules and orders laid down for the direc *312 tion of surveyors ;(f) a certificate of which was formerly returned to the Land Office, but now to the examiner-general,(g) to be by him critically reviewed; and if upon such examination, it is found to be erroneous, it is sent back to the surveyor for correction; after which it must be lodged in the Land Office within eighteen months from the date of the warrant on which it was made, or it will be deemed void;(h) and if ordered by the Chancellor to be corrected, it must be returned, together with the erroneous certificate, within nine months from the date of the order, otherwise it can never be received, (i) If the certificate is approved by the examiner-general, it is then taken to the treasurer, who, upon payment of the whole amount of the purchase money, endorses upon it a receipt, specifying that it has been fully compounded on ;(j) after which the certificate is received into the Land Office, and the day of its being so returned endorsed thereon as being then ready for a patent, if not opposed by a caveat. (k)
The dealing out of the vacant lands, which had never before been held in separate parcels, not merely as in England, at the time of the Norman conquest, or as after a rebellion in Ireland, among a few of the monarch’s favourites ;(l) but of the whole territory of the State, to an entirely new set of emigrants, who undertook to reduce the wilderness to cultivation, was then a proceeding of the most novel and interesting character, (m) The mode of granting lands by the king naturally suggested itself to the viceroy of Maryland as the best; and, as has been shewn, was accordingly as closely followed as the nature of things would permit. But when the Land Office was established, the business of disposing of the vacant lands had become, and was then rapidly swelling to a magnitude, that engrossed a large share of the attention of the government.
It was only by means of this department of the Chancery, called the Land Office, that a large proportion of the revenue derived from the sale of vacant, confiscated, or escheated lands, could formerly, or can now be ascertained; and consequently in that point of view, it must have been formerly regarded as a very important revenue office,(n) as it continues even yet to be productive. But contemplated in another point of view, it is evident, that it must *313 be considered as the fountain and depository of the primitive muniments of title to all the landed property in the State ;(o) in which respect, the surveys returned to, and the patents recorded in it, together constitute a domesday book, in which a 'more accurate description of all the lands of this State is to be found, than of the lands in the records of any other country whatever, (p)
Hence, instead of committing the affairs of this vastly important office, in the absence of the lord proprietary, to the care of a mere ministerial officer, called “The Clerk and.Register of the Land Office,” a council for lands was established, (1684,) to whom was assigned the duty of supervising the Land Office, and of determining upon all matters relating to land which might be brought before them, “by any of the inhabitants suing for acts of grace and favour therein;” according to a set of instruction’s specially describing their powers and duties ;(q) which powers and duties were, some years after, confided to a single person specially commissioned (1695,) for that purpose, (r) After which, by an order of the lord proprietary, (1721,) reciting, that the power of granting warrants for taking up waste, cultivated and uncultivated, and surplus land, and the finishing such warrants by making the grantees an estate of fee simple, had then chiefly centred in the deputy secretary ; and that the hearing and determining differences arising between contending parties in land affairs, which had usually been heard and determined in the Land Office, must naturally fall under his cognizance; he was empowered to judge and determine in those affairs, “ as far as he legally might, according to right, reason, and good conscience.”(s) More than ten years after which, by a special and distinct commission, one person was appointed (1732,) to be judge and register of the Land Office, with full power and authority to act, hear, judge, and determine in land affairs, according to right, reason, and good conscience, and the several instructions and orders which should from time to time, be given to him by the proprietary.(t) “Accordingly, in the instructions soon after sent to the Chancellor, as well as in those given to the judge and register of the Land Office, it was expressly declared, that he should be assisted in his determinations by the Chancellor. (u) And it moreover appears, that there was, for some time, an appeal allowed, during the provincial government, from the judge *314 of the Land Office to the Board of Revenue, and at other times, as to some matters, to the Chancellor, (v)
After a certificate was returned to the Land Office, it was formerly, as now, necessary that it should remain there six months to afford an opportunity to any one concerned to enter a caveat against the emanation of a patent.(w) But apart from, and in addition to the regular proceeding by caveat before the Chancellor, which it appears always might have been instituted, as at present, in any case where there was a proper ground for it, there were a variety of other causes of applications for relief, where nothing like ,a judicial controversy had been, or perhaps could be instituted or brought before a court of justice in any form whatever. If, after the lapse of the limited period no caveat is entered, and the register finds the certificate, and all other proceedings to be correct, he prepares a patent which is signed, sealed and issued as of course.(x) If the certificate, after having been returned to the office, has been assigned; or the holder of it has died, it is not necessary, as in England, to renew the whole proceedings; but it is sufficient to state the facts to the judge of the Land Office in a petition, accompanied by suitable vouchers, such as the written assignment itself, the will of the deceased, an affidavit of some disinterested person stating who were his heirs or devisees, &c., upon which a patent is ordered to be issued to the assignee, devisee, or heir; or, in doubtful cases, to one to hold according to his interest, to the uses of a will or the like. If the certificate or other proceedings are obviously erroneous in some immaterial particular, it may be corrected, on a petition setting forth the errors, (y)
As to these and all such anomalous cases, which were much more common before the revolution than at present, the application was made to the lord proprietary in person, (z) or to his council for lands, or to his judge of the Land Office; and it was considered not as the commencement of a judicial proceeding of any kind, but as “ suing for acts of grace and favour. ” As to all which matters the judges of the Land Office were in fact, but executive officers charged with the special direction, in peculiar and anomalous cases, of an establishment of great importance to the lord pro *315 prietary. The power to grant acts of grace and favour, which, under the proprietary government, had been thus confided first to a council for lands, and then to judges of the Land Office, was, after the revolution, recognised as having devolved upon the Chancellor; and it has accordingly been always so exercised by him; but,, it is merely a power to revise certain proceedings in respect to the sale of public lands, and to correct immaterial errors in cases, which involved none of that judicial power proper and necessary for the management and determination of controversies between two or more citizens, such as that which was then, and is now exercised by the Chancellor in determining on a caveat case.(a)
A caveat, in the Land Office, is a warning to the Chancellor not to put the great seal to a patent for a certain tract of land as prayed by the holder of the certificate of the survey. As all that relates to patents for land belongs properly to the commón law side of the Court of Chancery, here as well as in England, it necessarily follows, that a caveat must be the commencement of a judicial proceeding on the same side of the court with that to which it is opposed; and consequently, as to all controversies brought before the Chancellor, by caveat, he holds a common law court of record; or as it was formerly said, the proceedings are in “the Chancery Court of Records,” not in a mere court of equity. (b) And considering it as a court of record, it has, like all courts of common law or of equity of that description, the power to regulate its own practice and proceedings; which regulations become the law of the court, and of the case also, so far as they apply, (c) And as a grant for land can only be obtained through the Land Office, in which all the preliminary preparations for it are deposited, it follows, that a caveat can only be presented to the Chancellor in that office; and, in general, after the proceedings have been so far matured as to be ready to have the great seal put to the grant.(d) A caveat is most usually entered by a simple endorsement of the word “ caveat” upon the certificate, if there be one returned to the office; or otherwise by a note on the record opposite to the warrant, without any specification whatever of the cause of caveat;(e) but it can only be entered by the interested party himself, or by the direction in writing of his attorney, (f) And when entered, it cannot be permitted to continue longer than *316 twelve months, unless under special circumstances. A caveat by-two or more does not abate by the death of one of them, as it does where it has been entered by one only.(g)
The grounds upon which a caveat may be entered are various ; in general they must be such as shew, that no grant ought to be issued; because to do so would be unjust to the public, or to some individual ;(h) or because the applicant had, in some way, failed *317 to comply with the conditions of plantation ;(i) as where, under a warrant of resurvey, two or more distinct tracts, not contiguous by means of vacancy or otherwise, were attempted to be included in one patent, (j) or where the special warrant contained more than one location ;(k) or because the facts and circumstances set forth in the proceedings were, in some material particular, irregular, or untrue; as that the survey had not been made according to the rules of the Land Office; or, as in case of an alleged escheat, that the late owner had not died intestate and without heirs as averred by the applicant,(l) or if the lands are actually escheatable, that the per *318 son who died seized was indebted to the caveator, and others who were entitled to have the lands sold, and the proceeds applied in *319 satisfaction of their claims, (m) But the most common ground of caveat is, that the lands specified in the certificate on which the patent is asked, are not vacant; but are, in whole or in part, included in an elder warrant, entry, survey, or patent, (n) And, wherever the same land is contained in the certificates of both parties to a caveat, it is considered, that each of the parties has caveated. his antagonist, (o)
The method of bringing a controversy, instituted by a caveat, to a hearing appears to have been taken from that pursued in England; and was always, from a very early period of the provincial government, essentially the same as at present, (p) On a caveat being entered, both parties may be considered as actors; for, if called for, by either party, an order may be passed appointing a day for hearing; but no caveat can be dismissed without hearing, or giving the parties an opportunity of being heard, (q) After a party has thus obtained an order appointing a day for hearing, a subpoena is issued from the chancery office under the great seal, as formerly, to summon the opposite party to appear before the Chancellor to maintain, or to answer the;, caveat. And subpoenas may, in like manner, be issued to summon witnesses to testify, (r) If required, the parties may, by the same or a separate order, obtain authority to take the depositions of witnesses before any justice of the peace on giving notice as usual, and also, a direction to the surveyor of the county, or some other impartial person to survey the lands, and lay down the conflicting pretensions of the parties; and the surveyor may summon witnesses to give evidence on the survey, (s) Upon the return of all which, on the day appointed, the arguments of the parties are received by themselves, or their attorneys either orally or in writing; unless before, or on that day, further time be allowed for the hearing, of which the party obtaining the order must give his antagonist notice, (t)
The applicant for the patent must make out his case by shewing himself entitled to a patent for the tract of land he has caused to be designated in his warrant, his entry on the surveyor’s book, or by his certificate; and thus, in general, holding the affirmative, he opens and concludes the argument, (u) After which the case is *320 decided by the Chancellor according to right, to reason, and to good conscience; or in other words, according to the rules of the Land Office, and the whole law properly applicable to the case :(v) or he may decree thereon according to equity and good conscience, and agreeably to the principles established in the High Court of Chancery, as if the matter were brought before him by a bill in Chancery.(w) If the certificate be incorrect the Chancellor may, at the instance of the party, order the survey to be corrected in such manner as he shall direct, (x) In some cases, if the certificate be vacated, he may order other warrant to be issued to the party to the amount of the vacated certificate on which the composition had been paid ;(y) and, as in chancery, he may award costs and enforce the payment of them to the prevailing party, (z)
It is said, there are some instances to be found, within the early periods of the provincial government, in which controversies instituted by caveat have been tried in the courts of common law. (a) In proceeding by scire facias in Chancery to repeal letters patent, where an issue of fact is joined between the parties, as the Chancellor cannot call a jury before him, the case is sent to a court of common law for the purpose of obtaining the verdict of a jury upon it.(b) And so, in the instances alluded to, it might formerly have been the practice here in cases of caveat, as on a scire facias, to have the facts found by a jury convened in a court of common law. But however that may have been, it is certain, that no such practice appears to have ever prevailed in England, and that here, all caveat cases are now exclusively and finally determined by the Chancellor, from whose decision there never was, nor is at the present time any appeal allowed, (c) But, although there be no appeal properly so called; yet the party, if refused a patent, might have obtained redress from the sovereign, and, in that respect, unlimited discretion of the lord proprietary; or he may at present obtain it from the General Assembly of the State: or if the patent should be granted, the caveator is not concluded by it, for he may have it repealed by information or scire facias in Chancery, or nullify its , operation in an action at common law.(d) So that in either alter *321 native of putting or withholding the great seal, a direct appeal, in caveat cases, is thus rendered unnecessary; and, as regards the rights of the State, nugatory if not entirely improper, (e)
When a patent has been finally authenticated, by having had the great seal affixed to it, there can be no proceedings in the Land Office, by caveat, in relation to it, the Chancellor’s legal jurisdiction in that form, as keeper of tlie great seal, having been thus entirely cut off;(f) except in the case of a patent obtained in secret trust for a surveyor, (g) After a patent has been thus finally passed, it is, before its being delivered, recorded together with the certificate, assignment, petition, and order on which it was granted. (h) But it must be recollected, that all cases of caveat on the Eastern Shore are there brought before the judge of the Land Office for the Eastern Shore, from whose judgment there is an appeal allowed to the Chancellor, (i)
*322 From all which it appears, that the mode of obtaining a grant of public lands, and proceedings by caveat, on the common law *323 side of the Court of Chancery, to prevent the emanation of a patent, are, and always have been substantially the same in Maryland as in England; insomuch so as to leave little room to doubt, that the law and the forms of proceeding of Maryland, in relation to the making out of grants, and the proceeding by caveat, were derived entirely from those of England with only such modifications here as the circumstances of the country required.
But by an act of assembly touching the taking up of land, passed during the government of .the first Iprd proprietary, it was *324 among other things declared, that every one claiming title to any land in certain to be holden of his lordship, may demand his claim to be entered upon record, and such entry shall bar all ensuing grants .of the same land till the claim be tried, (j) This legislative provision may probably have been the suggestion from which special warrants arose ; and it is also not unlikely, that it gave rise to a practice, which was introduced not long after, of designating the land intended to be surveyed by a caveat in the office, and the marking of trees as a still more conclusive location and appropriation of the land until it could be actually surveyed. But this mode of designating lands by caveat endured but a short time, and is now entirely obsolete.(k) A caveat against the emanation of a patent, it will be recollected, has always been regarded as, in fact, the commencement of a judicial controversy; whereas this caveat in the office was nothing.more than a warning to all persons not to take up the lands therein described ; it was in truth no more than a special entry of the party’s claim upon record, like that made in a special warrant, or in a surveyor’s book; and had no analogy whatever to a caveat in chancery. It may also be well to recollect, that the proceeding by caveat in the Orphans Court, (l) as derived from the ecclesiastical courts of England, (m) is essentially different from the caveat in chancery against the emanation of a patent. And the term caveat has in our judicial proceedings been applied in other cases as an admonition to the court not to do certain acts, to which a party objected, until he could be heard; as not to record depositions taken under a commission to mark and bound lands,(n) or not to enter up a judgment or pass a decree upon an award, and the like.(o)
We may now pass on to the consideration of the case brought before the court by 'this caveat in the Land Office.
According to the known and long established principles upon which public lands may be acquired by an individual from the State, the title commences with the designation of the tract by the purchaser. After the date of the designation, and before a grant has been issued, the title is inchoative, and imperfect; but when a grant has been obtained, the title is then absolute and complete. A sufficient description of the land intended to be secured gives an *325 incipient title against every person who has not before taken some method to secure the same land.(p) It is held, upon common law principles, that the grant relates back to the date of the specification ; and, by a kind of jus postliminii, the purchaser is deemed to have had a perfect legal title from that period to all intents and purposes whatever.(q) He may maintain an action of trespass for any injury done to the land within that interval of time;(r) and he may, in that interval, if he has paid the whole caution money, obtain a warrant of resurvey, which is only incident to a legal title, and cannot he founded upon a mere equitable right of any kind.(s) On the death intestate of the holder of such an imperfect legal title, the right descends to his heirs, as real estate, to whom alone the patent can be granted. This doctrine of relation is founded upon principles of common law altogether and exclusively, (t) There are, however, some cases in which this imperfect title, which precedes the grant, is spoken of as being an equitable interest, (u) But that cannot properly be called an equitable title, which a court of equity cannot enforce, or have specifically executed. And it would seem strange to call that an equitable title, which, after a grant has issued, all common law courts, upon the common law principle of relation, treat as the commencement of a perfect legal title. Besides, to speak of an imperfect legal title as an equitable interest, has a tendency to confuse legal distinctions, and to obscure that which is otherwise sufficiently plain and clear.
In reference to tire jurisdiction of the Chancellor, in cases of caveat, the distinction between legal and equitable rights, properly so called, is unknown. The true and only difference, as regards his power in such cases, being that which exists between imperfect and perfect legal titles ; those which are merely in fieri, and those which are complete. The cognizance of all controversies respecting imperfect legal titles derived immediately from the State, belongs exclusively and finally to the Chancellor in his common law capacity as the keeper of the great seal, the affixing of which is essential to the authentication of a patent; which capacity of the Chancellor, as relates to patent grants for land, is designated *326 by his style of judge of the Land Office. The rules of decision by which the Chancellor is governed in the exercise of his jurisdiction, in all such cases, are to be found in the established law of the Land Office, or, in the absence of any such positive law, the rule of decision may be drawn from the principles of equity as established in the High Court of Chancery. The whole law of the Land Office is thus made up of certain positive regulations, of usages, and of common law and equitable principles respecting imperfect legal titles; or those contracts for land between the State and her citizens which are found in an immature and unfinished condition.
It is a well settled general rule, that under a special warrant the title to the land commences from the date of the warrant itself; because the description of its location, embodied in the warrant, has distinguished it from every other tract. The warrant is, therefore, in itself equivalent to a designation by an actual survey. So too the title commences with the date of a warrant of resurvey, and of an escheat, or a proclamation warrant. But upon a common warrant, it only commences with the date of the certificate of survey; or from the date of the entry of a special location upon the surveyor’s book. The land aimed at becomes thus bound, because of its haying been, by some of these modes, accurately described and distinctly specified. The reason of the rule is the same in all these cases, and the evils to be avoided alike in all.
The citizen is allowed one year, from the time he designates the land he proposes, to obtain, to complete his purchase, and perfect his title according to the prescribed rules. During which time the State stands pledged to sell that land to no one else. But the State might be greatly retarded, embarrassed and defrauded in making sale of its lands, if they could be tied up, and held bound by any loose, shifting, or indefinite description of them. And the allowing of lands to be bound by' vague descriptions, would be no less grievous in its consequences to individuals. No purchaser could be sure of his purchase. He might be jostled out of his location by one who had given no previous distinct intimation of its being that place or tract which he had in view. The records would furnish no sure guide; and the chief distinction between a common and a special warrant would be frittered down to nothing, or continued only as a delusive name.(v)
*327 All the questions that have been raised, in the discussion of the merits of this caveat, are therefore resolvable into this one: What is that degree of accuracy of the description of the land aimed at, which is deemed necessary in a special warrant to give it a binding effect? Upon this subject there seem to exist some difficulties which have not yet been removed, although the question has been often under the consideration of the Chancellor.
The distinction between a special and a common warrant, as now understood, and so well established, it is said, was not expressly and generally recognised until about the year 1750, when warrants having a location, by the specification of the particular place where the quantity of land therein called for was to be laid out, were called special warrants, in contradistinction from common warrants describing no place ; and which, therefore, might be applied any where, (w) It has been laid down, that the description contained in a special warrant should suit none but the land contended for; and should be so full and certain as plainly to point out the intention. But it is said, that, although the exact lines, limits, or boundaries, cannot be expected to be setv down before the survey is made, the description may, at least, point out to every inquirer the general situation of the land. It may at least enable a person to say of some spot or point that it is comprehended within the tract affected by the warrant. (x) And further, that there is some reason to doubt whether the rule was not less strict before the revolution ; since it appears, that the special warrants, in the years 1773 and 1774, seldom went further than to state the vacancy to be adjoining to some particular tract or tracts, either naming them, or the peison or persons in possession of them.(y) In a case where the special *328 warrant called for five hundred acres “ adjoining the west line of Gore,” it was held, that the description “was sufficient to *329 bind the vacancy to a certain extent;” but it is not said how far.(z)
In thg various instances put of describing the general, situation; of referring to some spot or point comprehended by the tract; or to the particular line, or corner, or extremity of the tract to which the vacancy is contiguous, and of such a description being binding to a certain extent; it is not said, nor is it perceived to what extent the binding effect of the description would be allowed to go ;. nor even if that could be settled, is it perceived how the fact of such obligatory'extent is to be ascertained and proved. It is certain that parol proof is wholly inadmissible for any such purpose.(a) It has been solemnly declared, that a warrant for one hundred acres, contiguous to a tract, of which the outlines are altogether twenty miles in length, cannot be thought to give an exclusive right to survey any one hundred acres contiguous to that extensive tract.(b) And it has been laid down with great attention as a rule, that if an angle of one tract runs up to or touches an angle, or even a side of another tract, there is no contiguity between that other tract and the land contained within the two lines forming the angle, (c)
In judicial proceedings involving the titles to land, the term location occurs very frequently; and its meaning varies with the subject spoken of. The word is used in speaking of a point or place of beginning, of a line, and of a whole tract. But in these cases, the meaning and the ideas conveyed are different. When .the location of a point is the subject spoken of, an indivisible part of space, a spot, comprehending no superficial extent, is alluded to. *330 When speaking of the location of a line, an idea of the place of a certain longitudinal extension, limit, or boundary, is presented to the mindbut in contemplating that subject, we form no idea of space, or any superficial extent. We can, however, have no other idea of the location of a tract of land, than that it is a space, a superficial extension, an area, a surface comprehended within certain confines. The word location, in reference to a tract of land, must, therefore, always be attended with these ideas. It is a place of greater or less extent. It may be a small lot, or it may be spread out to an extent of many hundreds of acres. It is still an individual, entire location, or place small or large.
The term location is also often used in our judicial proceedings as synonymous with the word description. Thus it is said, that the location is uncertain, that it is ambiguous, or that it has a double aspect. The word in these instances evidently means, that the description of the place, the. area, or the space of land is uncertain, ambiguous, or that it has a double aspect. Because the description of the land may have one or two aspects; it may be gratified in all its parts by being located in one position or another. But, it would seem to be absurd to say, that a place had a double aspect, or that it was a place which admitted of being put in one place, or in another place. Hence, in most, if not all instances, by ambiguity of 'location, uncertainty in the description of the location is really meant. For it is difficult to conceive how the location of any one piece of land can be deemed certain, or become known, in contra-, distinction to any other parcel, but by the accuracy of its description. The location or place of any one space or tract of land, it is most manifest, can only be distinguished from other spaces or tracts by the preciseness of its description. And that description does nothing towards the designation of a tract of land if it stops short of defining one whole and separate space or area.
By the rules for the direction of surveyors, the surveyor is required, upon the receipt of any common warrant, to note down in a book to be kept for that purpose, the time of receiving it, the quantity of acres included therein, the date thereof, and at what place the person who obtains it locates the same.(d) So that the entry of a special location in the surveyor’s book, is substantially the same as the entry of a special warrant with the register of the Land Office. In regard to which it has been laid down, that if a *331 special warrant, “ accurately describes the vacancy, it effectually binds it against all subsequent warrants or locationsand further, that “ whatever may be done by a common warrant, may be effected by a special warrant' of vacant cultivation. It makes no difference whether or not the survey under a special warrant includes part of the land designated by the special warrant. In fact, the important difference between the two warrants, is, that the special warrant, before survey, affects the land accurately described in it. The common warrant affects no land until it is surveyed, or located with the surveyor.”(e)
In short, the designation of the land given in the special warrant, or the entry upon the surveyor’s book, must be such a description of a space, an area, or a tract, as may be understood and ascertained by proof of the existence of the localities referred to; it must be such an one as will suit no other land, and be sufficient in itself without having any substantial matter supplied by parol proof, (f) This may seem to be requiring too great a degree of strictness; but it has long been the established law, and is not more rigid than a due regard to the public good requires. Certainty is the mother of quiet; and in nothing more so than in the titles to lands. The vacancy aimed at by a special warrant, is often embraced by two or more other tracts. A reported example of which may be found expressed thus: “ about one hundred acres vacant lying in A.- A. county, and adjoining or between a tract of land in possession of J. Brown, a tract of land belonging to J. Hall, and a tract of land in the possession of J. McDonald."(g) So in another instance where a particular neck of land was described. (h) Other examples may be imagined. Suppose the tract of land called Bellevoir to lay along, and parallel for some distance, within half a'mile of the river Severn, and the special warrant, were expressed in these words: “ about two thousand acres vacant, lying in A. A. county, between the tract called Bellevoir and the river Severn.” Or, suppose Browning’s Spring to be situated a short distance west from the mouth of the stream called the Little Crossings, the general course of which was north and south, and the Panther Pen was a short distance west of the same stream higher up; and the description in the special warrant was thus : “ about 200 acres vacant lying in Allegany county, west of and bounding on the Little Crossings, and between Browning’s *332 Spring and the Panther Pen.” In no one of these descriptions is any course, distance, or line distinctly named; yet it is perfectly manifest, that each one specifies a space, or area of land, so very accurately, that it cannot be mistaken, and in a manner that cannot be made to suit any other land.
After what has been said, the description given in Browning’s special warrant can.scarcely require a single remark. It is deficient in every particular, and in fact amounts to nothing. It does not describe any space, area, or tract of land whatever. It does no more than designate points or spots ; but whether by so doing it is meant to indicate the place where the outlines of a tract are to begin; or whether the quantity called for is to be laid off round them as the centre; or in what direction from them, is not said. But it will be difficult to conceive of a description which has more entirely excluded every idea of space, area, or tract, than that contained in this special warrant of Browning. For every purpose of giving title to any tract of land, it is a mere nullity. But allow to it every thing to which it can pretend; let it be considered as no more than a description of tire place of beginning; and then, even to that extent, it can now be of no avail to the party; since it appears by the certificate of survey, that the boundaries have not been commenced at the place thus specified; and the survey not having pursued the description given, it is in itself a total abandonment of every special pretension under the warrant, (i) As to the nature and sufficiency of the description of the place of beginning, which Cunningham caused to be noted down on the surveyor’s book, nothing need be said, as he has not relied upon it for any purpose. It appears from the plot returned, that Browning’s Hunting Ground runs entirely across Cheviot Bale. Browning may, therefore, have his certificate so amended as to comprehend either parcel of land within the. lines of his present certificate, which is not covered by Cheviot Bale.(j)
Whereupon it is adjudged, that the caveat of James Cunningham be and the same is hereby ruled good as to the whole extent of Browning’s Hunting Ground comprehended within the lines of the tract called Cheviot Bale. And it is further adjudged, that Meshak Browning have leave so to amend his certificate as to exclude all the land lying within the tract called Cheviot Bale ; and that the said Browning pay all costs.

 Gilb. Exch. 9, 10.

 Gilb. For. Rom. 12.

 8 H. 6, c. 16, and 18 H. 6, c. 6.

 Raysing’s Case, Dyer, 208; Page’s Case, 5 Co. 52; Doe Lessee of Hayne v. Redfern, 12 East, 96 ; F. N. B. 566, 569; 4 Inst. 225; Gilb. Exch. 103, 109; 2 Blac. Com. 244; 3 Blac. Com. 258; Shelf. Lun. & Idiots, 75.

 Moggridge v Thackwell, 7 Ves. 71.

 Vernon v. Benson, 9 Mod. 48; Ex parte Koops, 6 Ves. 599; Ex parte Beck, 1 Bro. C. C. 578; Attorney General v. Stewart, 2 Meriv. 153; 1 Mad. Chan. 4.

 1 Boz. His. Mary. 258.

 Com. Dig. tit. Patent C. 5 & D; Bac. Abr. tit. Prerogative F.; 2 Inst. 555; Gilb. For. Rom. 12; The Case of Alton Woods, 1 Co. 52.

 The Case of Alton Woods, 1 Co. 50.

 1 Mad. Chan. 18. 1 Chal. Opin. Em. Law, 55.

 3 Blac. Com. 49.

 Ex parte Beck, 1 Bro. C. C. 578; Ex parte Koops, 6 Ves. 599.

 Ex parte Fox, 1 Ves. & Bea. 67.

 Leighton’s Case, 2 Vern. 173; Ex parte O’Reily, 1 Ves. jun. 112; 1 Chal. Opin. Em. Law, 152; Ex parte Beck, 1 Bro. C. C. 578; Slingsby’s Case, 3 Swan. 178, note; 1 Mad. Chan. 18; 1 Hal. Con. Eng. 489, note; 2 Virg. Stat. 523, 531, 537.
The process of obtaining a patent for a new invention; and the mode of preventing the emanation of such a patent, in England, by a caveat, is substantially similar to that here described. Westm. Rev. Jan. 1835, art. 12. It would seem, that, under the colonial government as well as since the revolution, the exclusive right to a new invention could only be secured to the inventor by a special act of the legislature, 1 Virg. Stat. 374; 1784, ch. 20; 1786, ch. 23; April 1787, ch. 21, as the English statute of monopolies, 21 Jac. 1, c. 3, did not extend to the colonies, 1 Chal. Opin. Em. Law, 202. But this matter now belongs to the government of the United States, and has been regulated by the acts of Congress of the 21st February, 1793, ch. 11, and 15th February, 1819, ch. 19.

 1 Boz. His. Mary. 274; Land Ho. Ass. 13, 64, 255; Cassell v. Carroll, 11 Wheat. 134, 170.

 Land Ho. Ass. 319, 462, 469; 1795, ch. 88, s. 10.

 Land Ho. Ass. 186; Gilb. Exch. 89; 1 Chal. Opin. Em. Law, 150.

 Land Ho. Ass. 154, 245.

 Land Ho. Ass. 224.

 Land Ho. Ass. 102, 114, 174, 194, 261, 283, 319; Lord Prorietary v. Jenings, 1 H. & McH. 119; Kilt. Rep. 14 Ed. 3, c. 8, & 8 H. 6, c. 16; Land Records, lib. C. B. 13, &c.; Chan. Pro. lib. C. D. 78; lib. P. L. fol. 90; lib. J. R. fol. 242, &c.

 Greaves v. Dempsy, 1 H. & McH. 65; Lord Proprietary v. Jenings, 1 H. & McH. 119, 138; Thomas v. Wootton, 4 H. & McH. 428.

 Land Ho. Ass. 160, 162, 176; Owings v. Norwood, 2 H. & J. 96.

 Land Ho. Ass. 319, 435, 438; 1800, ch. 70.

 Land Ho. Ass. 300; Ringgold v. Malott, 1 H. & J. 317.

 Land Ho. Ass. 301, 332; Ringgold v. Malott, 1 H. & J. 317; Owings v. Norwood, 2 H. & J. 96; Hall v. Gittings, 2 H. & J. 112.

 McCreery v. Allender, 4 H. & McH. 409; McCreery v. Wilson, 4 H. & McH. 412; Fairfax v. Hunter, 7 Cran. 619.

 1799, ch. 79, s. 7.

 Land Ho. Ass. 439.

 Decl. Rights, art. 24; 1809, ch. 138, s. 10.

 Land Ho. Ass. 30, 39.

 Land Ho. Ass. 64.

 1 Boz. His. Mary. 292; Land Ho. Ass. 64.

 Land Records, lib. No. 1, folio 195.

 Land Ho. Ass. 108, 232, 283.

 Thornton v. Edwards, 1 H. McH. 158.

 Land Ho. Ass. 114, 122, 178, 181.

 Com. Dig. tit. Chancery C. 1 & 2; 2 Mad. Chan. 712.

 Land Ho. Ass. 43, 65, 76, 93.

 Land Ho. Ass. 54, 56, 62, 128.

 Land Ho. Ass. 75.

 Land Ho. Ass. 43, 65.

 Land Ho. Ass. 41, 66, 82.

 Land Ho. Ass. 126.

 Land Ho. Ass. 219.

 Constitution, art. 51.

 Land Ho. Ass. 300, 305, 307; November, 1781, ch. 20, s. 12.

 Land Ho. Ass. 466.

 Land Ho. Ass. 232, 261, 275, 282.

 Land Ho. Ass. 318, 367, 470,

 Land. Ho. Ass. 322; Steuart v. Mason, 3 H. & J. 507.

 Land Ho. Ass. 285, 435.

 Land Ho. Ass. 149, 322.

 November, 1781, ch. 20, s. 6.

 Land Ho. Ass. 469.

 Land Ho. Ass. 186, 359.

 Per Kilty, Chancellor, 26th April, 1815, and per Bland, Chancellor, 6th June, 1834; Land Ho. Ass. 443.

 Land Ho. Ass. 173, 362, 470; Hall v. Gittings, 2 H. & L 125.

 Land Ho. Ass. 62, 65, 435.

 1795, ch. 88, s. 7.

 Land Ho. Ass. 273, 325, 466.

 Land Ho. Ass. 466.

 Land Ho. Ass. 256, 260, 261, 275, 319, 322.

 November, 1781, ch. 20, s. 3 & 6; Digges v. Beale, 1 H. & McH. 67; Lord Proprietary v. Jenings, 1 H. & McH. 140.

 Godw. Com. Eng. b. 4, c. 27.

 Land Ho. Ass. 299.

 Land Ho. Ass. 302.

 Cockey v. Smith, 3 H. & J. 26.

 Land Ho. Ass. 300.

 Land Ho. Ass. 108, 112.

 Land Ho. Ass. 127.

 Land Ho. Ass. 227.

 Land Ho. Ass. 231, 260, 268, 269.

 Land Ho. Ass. 232, 234.

 Land Ho. Ass. 262, 273, 283; Chancellor’s Case, post, note r.

 Land Ho. Ass. 278, 492; April 1782, ch. 38, s. 2.

 Land Ho. Ass. 492.

 Land Ho. Ass. 323, 434, 493, 494; Lloyd v. Tilghman, 1 H. & McH. 86; Lord Proprietary, 1 H. & McH. 135; Joice v. Harris, 1 H. & McH. 196; Hall v. Gittings, 2 H. & J. 112.

 Land Records, lib. C. B. 143, &c.

 Land Ho. Ass. 273, 434; November, 1781, ch. 20.

 Land Ho. Ass. 331, 465.

 Land Ho. Ass. 434, 442, 461.

 Land Ho. Ass. 467.

 Land Ho. Ass. 321, 379, 487.

 Land Ho. Ass. 442, 443, 487, 491.

 Land Ho. Ass. 283, 442, 443, 490; 1797, ch. 114, s. 10.

 Land Ho. Ass. 90, 91, 304, 449, 453, 491.
Ridgely v. Johnson. — 24th November, 1801. — Hanson, Chancellor. — The Chancellor having examined all the depositions in this cause, produced to support the allegations of the parties, together with the plot returned for illustration; and having considered also the arguments of the counsel on each side, and having deliberated thereon, is of opinion as follows :—
He must first make some preliminary remarks. — When a man caveats a certificate, on the ground that the land, surveyed as vacancy, is comprehended in his patent; unless the Chancellor is thoroughly satisfied, that the fact is so, it is the invariable practice to dismiss the caveat, suffer a patent to be issued on the certificate, and leave the parties to contend at law, before a court and jury. And for this plain reason, that a dismission puts an end to the pretensions on one side, but leaves the other party, viz. the caveator, in a condition so to contend. Besides, the State is interested. If the caveat be allowed, it may be, that the Slate thereby loses the benefit of granting vacant land.
But independently of the claim or pretensions of a caveator, or caveators, it is clear that, if in any case it appears, that the land comprehended in a survey is not properly grantable, no patent ought to issue for the same. That this position is just, appears from the decree of Chancellor Rogers, who in the year 1783, vacated a patent, on the ground that the land therein contained was not grantable. For surely, if a patent be repealed, or vacated on that ground, it must be supposed, that a patent would not have issued, if the ground had been known, before the patent was granted.
That the law respecting accretion, alluvion, and islands, in small waters'or rivers, is part of the law of Maryland, as well as of the law of England, and indeed as of the law of nature, the Chancellor, on reflection, entertains not a doubt; and in his conception, it is of no consequence, whether the persons, having lands on such waters, acquired their title before, or after the islands, opposite to their lands, were formed. They had, at any rate, a common right to the river; and, of course, either one, or all of them, has a right to the benefit of an island formed in the river. And even, if they have not an exclusive right to the benefit of such islands, it seems, at least, that all those, having lands in the river, or the inhabitants in general of the State, must have that right. In this State, it may be said, that a man can claim nothing, except what is contained, or described in his patent. But the right of following the water, or having the benefit of accretion, has been admitted; and mighty inconvenience would result if it were not so settled. And the common right of those having land on small waters to the little islands, which are formed after their titles acquired, seems at least as reasonable, as the right of accretion. But the principle of the case decided by Mr. Rogers applies to the present case. In short, it appears to the Chancellor,'that a patent cannot possibly, with propriety, issue to the defendant in this cause; although what person, or persons, or whether any person may be exclusively entitled to the flat, island, or marsh, surveyed by the defendant, mav hereafter be a subject of litigation.
*317 Upon the whole, it is adjuged, ordered, and decreed, that the caveat of the said Charles Ridgely against Horatio Johnson’s certificate of a tract of land, called Johnson’s Meadows, be, and it is hereby declared to be, allowed, and ruled good.

 Land Ho. Ass. 327, 453; 1795, ch. 83, s. 11; Lloyd v. Tilghman, 1 H. & McH. 86; Hammond v. Ridgely, 5 H. & J. 263.

 Land Ho. Ass. 390, 421, 422, 447; West v. Hughes, 1 H. & J. 11 & 13.

 Land Ho. Ass. 444.

 Land Ho. Ass. 381.
Aisquith v. Godman. — It appears from the statement of facts agreed on by the parties, that of lot No. 40, in the city of Baltimore, a certain William Nicholson was seized in fee simple on the 20th of June, 1761; and, being so seized, he made his will, and thereby devised it to his niece Elizabeth Connell, in fee tail general, remainder to his brother John Nicholson, of the county of Cumberland, in England, and his heirs; which said John Nicholson never was a citizen of the State of Maryland ; — That William Aisquith, the caveator, intermarried with Elizabeth Connell, the devisee, by whom he had issue a son, John Aisquith; — that Elizabeth Aisquith died on the first of January, 1782, leaving her husband, the present caveator, in possession of the lot, and their only child, John Aisquith, who died intestate and without issue on the 1st of July, 1785. It is further stated, that the caveator took out a warrant of escheat on 'the 15th of' October, 1785, to affect said lot, and returned a certificate thereof, but did not compound thereon; and the caveatee, Samuel Godman, on the 3d of June, 1798, proclamated the said certificate, and returned his certificate thereof to .the office on the 29th of May, 1797; on which the said Aisquith entered a caveat against a patent issuing thereon; alleging, that by the laws of this country, the said lot is not liable to be affected by an escheat warrant, and is not escheatable.
24tk May, 179S. — Hanson, Chancellor. — The said caveat being submitted to the Chancellor, on a statement of facts, signed by the counsel on each side, the said statement, and the certificate, and all other papers thereto relative, were by the Chancellor read and considered.
It appears to him, that the facts contained in that statement are conclusive for the caveator. It is stated, that Elizabeth, the wife of the caveator, being tenant in tail of the land in question, died in 1782, leaving one child only, a son, who died without issue in 1785; that after her death a warrant of escheat .was taken out by the caveator, who returned a certificate; and that, on his failing to compound, the defendant took out a warrant of proclamation, and returned the certificate which is caveated.
There is no rule in this office better established than this, — that the validity of a proclamation warrant must depend on the warrant, under which the land intended to *318 be affected by the proclamation warrant, was surveyed. In the present case, it Í3 clear, from the statement, that the escheat warrant, under which the survey, proclamated by the defendant, was made, was invalid. The act of November, 1781, ch. 20, sec. 8, expressly says, that no escheat warrant shall be good, unless the owner (that is, the person on whose death it issued) hath died seized in fee simple. But here the warrant recites the dying seized of the aforesaid Elizabeth Aisquith as the ground of the escheat; and it appears from the defendant’s own shewing, that she did not die seized in fee simple ; hut that the land descended from her to her son, as issue in tail, and no attempt is made to show, that the land was otherwise liable to escheat.
The admission of the parlies, which is at least equal to the result of a trial at law, has precluded a point, which might perhaps have been otherwise made.
Upon the whole, it is adjudged, and ordered, that the caveat of William Aisquith against Samuel Godman’s certificate of lot No. 40, in the ci1y of Baltimore, be, and it is hereby declared to be good, but that each party shall hear his own costs.
Hammond, in behalf of the Baltimore Company v. Godman. — 28th December, 1799. — Hanson, Chancellor. — The caveator having taken out a subpoena from chancery, for the defendant to appear here on this day, to answer the said caveat ; and the defendant appearing, as he alleges, in consequence of the service on him of the said subpoena, which is by him produced, there was presented to the Chancellor in behalf of the said caveator, and as the support of his caveat, a deed from Daniel Nicholson, for conveying to the company aforesaid the land in question. In the said deed, Daniel Nicholson is recited to be the heir of John Nicholson, the patentee of the said land, on whose supposed dying seized without heirs, the escheat warrant in this case was obtained by the defendant. No proof, except the said recital (which cannot operate otherwise than against the grantor, and those claiming under him,) is offered, to prove that the said land actually descended from the patentee to the said Daniel Nicholson, or that the said patentee ever conveyed or devised the said land to any person whatever, or that the said patentee has left any person capable of taking as his heir.
On a certificate, returned to this office, in consequence of an escheat warrant, it Í3 the settled rule and practice, founded on the plain principle of benefit and convenience to the State, and on common sense, that the caveator of the certificate shall shew a title in himself, or in some other person. If he cannot do this, why should not the person, who applies for the land as escheat, and is willing to pay the State accordingly, he allowed to take a patent. The State assuredly is interested in, or at least cannot suffer from permitting him to taire it as escheat, on the prescribed terms. He alone incurs a risk; and the patent, which he obtains, is not to invalidate, or affect, the right of any other person. The patent puts him in a condition fairly to contest the question with any person, who claims the land, under a superior title ; and it is certainly nothing more than right, that the title he fairly tried in ejectment. Whatever title the aforesaid company has in the land, it will not he affected by a patent to tire defendant.
The Chancellor malees these remarks, because he conceives it probable, that the practice and rules of this office may not be generally understood.
On the whole, it is adjudged and ordered,that the caveat of William Hammond against Samuel Godman’s certificate of a tract of land, called Nicholson’s Delight Rectified, he, and it is hereby declared to he, dismissed; and that the said caveator pay to the defendant, Samuel Godman, all costs, by him incurred in defence of the caveat aforesaid.

 1785, ch. 78.

 Land Ho. Ass. 83; West v. Hughes, 1 H. & J. 9.

 West v. Hughes, 1 H. & J. 10.

 Land Ho. Ass. 73, 83.

 Garretson v. Cole, 1 H. & J. 374; April 1782, ch. 38, s. 8.

 Land Ho. Ass. 331, 488; April 1782, ch. 88, s. 11.

 Land Ho. Ass, 426, 488; 1789, ch. 35, s. 6.

 Land Ho. Ass. 489.

 Land Ho. Ass. 453.

 Land Ho. Ass. 316, 373, 374, 400, 446, 452, 462; November, 1731, ch. 20, s. 6.

 1789, ch. 35, s. 4; Land Ho. Ass. 384; Hammond v. Warfield, 2 H. & J. 151.

 Land Ho. Ass. 403, 420, 450; West v. Hughes, 1 H. & J. 9.

 Land Ho. Ass. 473.

 1797, ch. 114, s. 8.

 Land Ho. Ass. 84, note; Noland v. Cromwell, 4 Mun. 160.

 1 Mad. Chan. 4.

 Land Ho. Ass. 388, 409, 410, 415, 418, 424.

 November, 1781, ch. 20, s. 13; Carvill's Lessee v. Griffith, 1 H. & McH. 316; Report of D. Dulany, 1 H. & McH. 554.

 Land Ho. Ass. 496.

 Land Ho. Ass. 495.

 1789, ch. 35, s. 2.

 Land Ho. Ass. 495.

 1795, ch. 61.
Willing v. Wright. — 25th May, 1802. — Hanson, Chancellor. — This is the case of an appeal to the Chancellor from the decision of the judge of the land office of the Eastern Shore. The act of assembly, creating the place of the said judge, and giving an appeal from his decision, not having directed in what manner the appeal shall be prosecuted; but a transcript from the register of the said office, to the register of this office, of proceedings in the case of Evans Willing against Sowan Wright, having been here filed ; and the said Wright praying the Chancellor to take order in the case, for the purpose of bringing it to a final decision ; the Chancellor, on deliberation, passed an order on the 6th day of March last, to he served on the said Willing. In case of such service, and the appearance here on this day of Willing, in person, or otherwise, the Chancellor, according to the said order, was to proceed to an examination and decision. In case of such service, and no appearance, the Chancellor, according to the said order was io dismiss the appeal.
Now here, this day come both parties. Willing acknowledges the due service of the order, and does not say otherwise, than that he is ready for a decision.
On examination of the said transcript, and of certain papers mentioned in it, the Chancellor perceives no reason, wherefore he should reverse the decision. Indeed the transcript is so defective, that he can scarcely perceive what were the points of dispute. However, there is nothing in it to show, how Willing, the caveator and appellant can possibly be injured by Wright’s obtaining a patent, and although it is very unusual with the Chancellor to give an opinion on a point of law, he does not hesitate to concur with the judge’s opinion, on what appears the great point, viz.: the construction of Ranter’s will to Hall. The point indeed is so plain, as not possibly to admit of a doubt amongst lawyers.
Upon the whole, it is adjudged, ordered and decreed, that the order and adjudication of Thomas I. Bullett, judge of the land office of the Eastern Shore of Maryland, in the case aforesaid, of Evans Willing against Sowan Wright, made on the 24th January 1801, be and it is hereby affirmed, or that the appeal of the said Willing from the said order and adjudication, is hereby dismissed; the Chancellor being *322 really doubtful, whether, under all circumstances, the appeal should he said to be dismissed, or the decision of the judge be said to be affirmed. The meaning of the Chancellor is, that nothing he gained by the appeal, and that hereafter it be no obstacle to the said Wright’s obtaining a patent.
The said act of assembly does not direct, what shall be done in case of an affirmance on an appeal. But the Chancellor conceives, ihat he may with propriety direct, and accordingly he does hereby direct, that the transcript aforesaid he returned, along with an attested copy of this adjudication, order or decree, to the register of the land office of the Eastern Shore; and that, on the receipt of the said transcript, there shall be the same proceedings in the said office, on the certificate of resurvey of Sowan Wright, which was caveated by Evans Willing, as if there had been no appeal as aforesaid.
Hopper v. Coleston. — 2d March, 1S03. — Hanson, Chancellor. — The said William Hopper appeals from the decision of the judge of the land office for the Eastern Shore, on a caveat there instituted by him against the appellee, or defendant. The transcript of the proceedings in the said office on the said caveat, except the plat there exhibited for illustration, are here filed by the said appellee ; and it was, at his instance, that this day was appointed for hearing the appeal, by an order, passed on the 1st day of December last. It appears, that a copy of the said order has been duly served ,.on the appellant, from whom the Chancellor lately received a letter, praying a postponement of the hearing. The defendant, James Coleston, now appears here, in person, and prays the Chancellor to proceed to a decision.
As Mr. Hopper’s application for a postponement is principally grounded on the idea, that the Chancellor may direct new evidence to he taken, before he decides, in the same manner, as if he were about to exercise an original jurisdiction, this ground must certainly fail. An appellate jurisdiction has to decide merely whether or not the inferior jurisdiction gave a just decision on the case before it. Were the appellate jurisdiction to admit new proofs, it would decide on a case, different from that which was before the lower tribunal; and therefore, it would not appear, from its decision, whether the first decision was right or wrong.
The Chancellor proceeded to examine the transcript, with a view of being informed of the nature of the case. Mr. Hopper had, in his letter, stated, that indisposition would prevent his attendance on this day. It was the Chancellor’s Intention, if the case should appear difficult, or if the transcript should be materially defective, to postpone the decision.
It is certain, that the plat, for illustration, ought to have been part of the proceedings, transmitted to this office; hut the full perspicuous statement, made by the judge enables the Chancellor to understand the case, as fully without, as with the plat; and there seems to he not the least difficulty in the case, every point therein having long since been settled in this office.
A question Indeed might be made, whether or not an appellate court can give relief to an appellee; that is to say, whether or ’not the said court ought not to confine itself to the question, whether or not the appellant is entitled to relief. But the High Court of Appeals, in the case of Scott against Chapline, gave relief to Scott, who was satisfied, and did not appeal, against Chapline who was dissatisfied, and therefore did appeal. But setting this precedent aside, the Chancellor conceives it his duty to rectify mistakes in whatever way he may be apprized of them; and particularly to have the rules here established to prevail on the Eastern Shore.
*323 The judge of the Eastern Shore land office in effect has said, that Coleston could, under his warrant, survey no land which did not correspond to the description or location of his warrant. But it has been here long since settled, that a special warrant shall be allowed to do every thing, which a common warrant might do. It appears, that a common warrant might have affected any part of the vacancy comprehended in Coleston’s certificate, that is to say, that no other warrant affected it; and therefore it is rightly comprehended in Coleston’s certificate. The Chancellor is glad of an opportunity of informing the judge of the Eastern Shore land office of an important'point, of which the said judge could not reasonably be supposed to be apprized; and which whether it be right or wrong the present Chancellor did not decide. It was in fact decided under the former government.
Under a common warrant any uncultivated vacant land, not before surveyed, or located, may be affected. A special warrant of vacant cultivation is, intended to affect a particular vacancy described in the warrant. If it accurately describes the vacancy, it effectually binds it, against all subsequent warrants or locations. But nothing is better established than this, — that a special warrant of vacant cultivation may abandon its first intention and may be used to affect any lands, which may be affected by a common war-rant, however distant they may be from the land described in the special warrant.
It appears then to the Chancellor, that the judge’s direction to exclude the vacancy not contiguous to the land, mentioned in the special warrant, is wrong; and that Coleston is entitled to a patent for every part of the land, included as vacancy in his certificate, when certificates of the several parts shall be returned, and
It is accordingly adjudged and ordered, that the transcript of the record in this case be returned to the aforesaid judge, and that he be and is hereby directed to proceed, and to direct proceedings for carrying into effect his decision for returning as many separate certificates of the vacancy, surveyed for the defendant, James Coleston, as there appear to be distinct pieces of vacancjr, in the certificate of “ Guardian’s Neglect.”
The Chancellor’s decision, or rather his declaration of the rules of the land office is simply as follows : — -whatever may be done by a common warrant, may be affected by a special warrant of vacant cultivation. It makes no difference whether or not the survey under a special warrant includes part of the land designated by the special warrant. In fact the important difference between the two warrants is, that the special warrant, before survey, affects the land accurately described in it. The common warrant affects no land, until it is surveyed, or located with the surveyor. When a certificate has returned two or more distinct tracts, each having a certain beginning, the surveyor is directed to return several distinct certificates on each of which a patent is to be obtained. ,
As to costs, they are left to the discretion of the judge.

 1642, ch. 51; Land Ho. Ass. 248.

 Land Ho. Ass. 215.

 Dep. Com. Gu. 160; 1798, ch. 101, Sub-ch. 2, s. 9.

 1 Jac. Law Dict. 407.

 Roch v. Giles, 1 H. &. McH. 186.

 Dorsey v. Jeoffray, 3 H. & McH. 121; Shelf. Lun. & Idiots, 104, 654, 624; In matter of Fust, 1 Cox. 418.

 Land Ho. Ass. 461.

 3 Blac. Com. 210.

 Chapline v. Harvey, 3 H. & McH. 396.

 Land Ho. Ass. 152, 149, 420, 427, 447, 455.

 Lloyd v. Tilghman, 1 H. & McH. 85; Spalding v. Reeder, 1 H. & McH. 189; Hath’s Lessee v. Polk, 1 H. & McH. 363; Report of D. Dulany, 1 H. & McH. 553; Kelly’s Lessee v. Greenfield, 2 H. & McH. 133; West v. Hughes, 1 H. & J. 13; Beall’s Lessee v. Beall, 1 H. & J. 347.

 Howard v. Cromwell, 4 H. & McH. 329, & 1 H. & J. 118; Ringgold v. Malott, 1 H. & J. 317; Beall’s Lessee v. Beall, 1 H. & J. 348.

 Report of D. Dulany, 1 H. & McH. 553; Land Ho. Ass. 401.

 Land Ho. Ass. 84.

 Land Ho. Ass. 401.

 Fowler v. Goodwin. — 8th April, 1809. — Kilty, Chancellor. — The proceedings and the grounds of the caveats, as stated in the argument, have been fully-considered, and notwithstanding the several objections made to these certificates, the Chancellor considers it as a point clear of any doubt, that the caveats cannot be sustained.
It appears that a special warrant was obtained by Goodwin, and others, on the 23d of May, 1774, to take up 400 acres of vacantland, stated to be adjoining to the following tracts of land, or some of them, viz. Nicholas and John, 3d, 4th, 5th, 6th, 7th, 8th, 9th, 10th discoveries, &c. Several certificates, including those now in dispute, were returned in May, 1776; and patents thereon not having been issued, the present caveats were entered in September, 1807.
One of the objections stated by the caveator is, that patents were not taken out within two years, according to the ilth section of the orders and instructions in 1733. The Chancellor is not satisfied of the validity of this objection; nor is he informed *328 of any case in which it has prevailed. There is apparently still less force in the objection arising from the situation of the chain-carrier, as proved by the deposition of Samuel Hawkins, and also in the trifling errors in the phraseology of the war-rant, which were mentioned in tire argument. It would seem, therefore, that the point most relied on by the caveator, is the want of precision in the location, or as he expresses it, the location being too broad.
It is certainly the interest of every person who takes out a special warrant, to describe or locate the land as clearly and precisely as he can, in order to bind and secure it from the operation of other warrants; but there is no set form, or expression required in order to comply with the general rule, which (as laid down by the late Chancellor in 1793,) was, that the description of the warrant should suit none but the land contended for, and that it should be so full and certain as plainly to point out the intention. There is, however, some reason to doubt whether the rule was not less strict before the revolution, for it appears that the special warrants in tire years 1773 and 1774, seldom went further than to state the vacancy to be adjoining to some particular tract or tracts, either naming them or the persons in possession of them.
In the case of Pumphrey v. Wallace, the reasons for allowing the caveat of the latter are not expressed, and can only be inferred from what appears on the papers ; because it would be totally improper to take the opinion of C. Wallace, as expressed in his deposition, or that of any other person, as evidence of such reasons. Pumphrey’s warrant was dated the 28th of December, 1792, and executed on the 6th of February 1793. But Wallace had taken out a warrant of resurvey on the 18th of January, 1793; so that the question must have been how far the location made in Pumphrey’s warrant was binding, so as to prevent the operation of the warrant of Wallace, which bound all the contiguous vacancy, supposing it not previously secured. The vacancy in dispute consisted of cultivated land, as appears by the receipt of the treasurer for improvements ; and it may be inferred, that the caveat was ruled good on the ground of the location in Pumphrey’s warrant being vague and indefinite, as was decided in the case of Beatty v. Orendorf, in 1793, (Land Ho. Ass. 400,) in which the vacancy was also cultivated land, and the claim of Orendorf on a warrant of resurvey.
It is not, however, necessary in the present cases, to determine whether the location or description in the warrant, was sufficient to bind or secure the vacancy aimed at, or to say what would be the result of the facts established by the depositions and the surveys returned, because the several parcels of land returned in Goodwin’s certificates do not appear to have been cultivated, or to have had improvements thereon; and therefore must be taken as uncultivated, and liable to be affected by a common warrant, and it will be observed, that two of the certificates returned by the caveator on his warrant, supposed to include the same land, are for uncultivated land, and the improvements on the other three are only a few fence logs.
It was stated in the argument, that the warrant was not a proper one — that it was neither a special nor a common warrant. But, although it was not simply a common warrant, yet it might be used as such, and the general tenor of special warrants was, and still is, to direct the surveyor to lay out the said quantity, be the same cultivated or otherwise. On this subjeetthe following points appear to have been settled:— That a special warrant shall be allowed to do every thing which a common warrant might do; — that a special warrant may abandon its first intention, and may be used to affect any lands which may be affected by a common warrant, however distant they may be from the land described in tile special warrant; and that, in such case, *329 it maíces no difference whether or not the survey under a special warrant includes part of the land designated by the special warrant. It is well known that a common warrant .binds or affects the land at the time of its location with the surveyor, and a fortiori, it must bind at the time of the actual surveys which, in these cases, was many years before the date of the- caveator’s warrant.
The application of the above principles to the matter in dispute, being sufficient for its decision, it will not be necessary to remark on some other grounds of defence which were urged by the counsel for Goodwin. But, with regard to the opinion of Mr. Callahan, the late register, concerning the certificates now caveated, as stated in the depositions of Oliver Cromwell, it is thought proper to declare explicitly, that such evidence of the opinions of that officer can have no possible influence in any ease now to be decided.
It is adjudged and ordered that tile aforesaid caveats be dismissed with costs.

 Mortland v. Smith, MS. 19th April, 1815.

 Beatty v. Orendorf, Land Ho. Ass. 402.

 Beatty v. Orendorf, Land Ho. Ass. 401.

 Whitford v. Jones, Land Ho. Ass. 413.

 Land Ho. Ass. 435.

 Hopper v. Coleston, ante, 322.

 Beatty v. Orendorf, Land Ho. Ass. 402.

 Garretson’s Lessee v. Cole, 2 H. & McH. 459.

 Land Ho. Ass. 87.

 Land Ho. Ass. 472, 480.

 Garrettson v. Cole, 1 H. &. J. 374.